**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MIGUEL NEIL,**

          **Petitioner,**

          **v.**

**WARDEN, NOBLE
CORRECTIONAL INSTITUTION,**

          **Respondent.**

          **CASE NO. 2:18-CV-1721
JUDGE JAMES L. GRAHAM
Chief Magistrate Elizabeth P. Deavers**

**ORDER and
REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. This matter is before the Court on the Petition, as amended, Respondent's Return of Writ and supplemental response, Petitioner's Traverse, and the exhibits of the parties. For the reasons that follow, the undersigned **RECOMMENDS** that this action be **DISMISSED.**

Petitioner's unopposed Motions for Leave to Supplement the Record and Traverse Brief (ECF Nos. 30, 31) are **GRANTED**.

## I. Facts and Procedural History

Petitioner challenges his October 31, 2014 convictions after a jury trial in the Franklin County Court of Common Pleas on 30 counts of robbery and 6 counts of kidnapping. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 2} The charges against appellant arose from a series of robberies that occurred in 2011 and two robberies that occurred in 2012. On November 15, 2012, immediately following the final robbery, Columbus police arrested appellant. Appellant was indicted in common pleas court case No. 12CR–5963 on 4 counts of robbery and 6 counts of kidnapping arising from the 2012 robberies. He also was indicted in common pleas court case No. 13CR–4174 on 26 counts of robbery and 1 count of kidnapping arising from 13 separate robberies committed in 2011.

Pursuant to motion filed by plaintiff-appellee, State of Ohio, the trial court joined the indictments for a single trial. Appellant moved to sever the indictments but the trial court denied the motion. Appellant also moved to suppress certain evidence but the trial court denied that motion. The charges were tried to a jury during a six-day trial beginning September 24, 2014, and ending October 1, 2014.

A. Robberies Committed in 2011

{¶ 3} The state presented witness testimony, as well as video and photographic evidence, related to the 13 robberies the state alleged appellant committed in 2011.

{¶ 4} On March 23, 2011, a Subway restaurant at 3626 Gender Road was robbed. An employee testified that at approximately 9:30 p.m., a man dressed in all black and brandishing a small handgun entered the restaurant demanding money. The robber wore a hood and a mask covering his face; the employee could only see from the bridge of the robber's nose up because the lower portion of the robber's face was covered by the mask. The robber ordered the employee to get on the floor and not to look at him. The robber then reached over the counter into the cash register, which the employee had opened. The robber did not jump over the counter or step into the area behind the counter. The employee testified that the robber was a dark-skinned African–American man with a normal build, approximately 5′10″ to 6′ tall, weighing 180 to 220 pounds. The state also introduced photos taken from the restaurant's security camera. In the photos, the robber, who is wearing dark clothing, including a hood and mask, dark shoes, and dark gloves with white markings or letters, can be seen pointing a handgun, which is held in his left hand.

{¶ 5} On April 18, 2011, a Subway restaurant at 354 West Third Avenue was robbed. A customer who was present that evening testified that a man entered and announced that he was robbing the restaurant. The robber then ordered the customer and employees to get down on the floor. When the customer did not move, the robber pushed him down to the floor. The robber then took two Subway employees into the area behind the cash register. The customer testified that the robber was an African–American man with a medium-to-dark complexion and a deep voice. He stated that the robber wore dark gloves and a very dark blue hooded sweatshirt with the drawstring pulled so that only part of his face and mouth were visible. The customer testified that the robber was medium height and "had a potbelly or close to it." (Sept. 25, 2014 Tr. at 138.) One of the two employees who were present testified that the robber entered the store holding a small gun, pointed the gun at the back of the customer's head, and told the employee to go to the front of the store and get the money. She testified that the robber was wearing dark colors and she could only see his eyes. She stated that the robber made them all get down on the floor, then took the money from the register and left. A video of the robbery from the restaurant's surveillance system was played for the jury, with the employee narrating the events depicted. The employee pointed out that the robber held the gun in his left hand. The second employee who was present during the robbery also testified. She indicated that the robber was wearing gloves and carrying a handgun,

and that he used his right hand to take money out of the cash register. She said that the robber was an African–American male with a deep voice and that she believed he was approximately 5′8″ tall.

{¶ 6} On May 8, 2011, a Tim Horton's restaurant at 6780 East Main Street was robbed. An employee of the restaurant testified that the robbery occurred near the end of his shift, around 9:10 p.m. He testified that the robber was an African–American male who wore a black ski mask, black hooded sweatshirt, black pants, and brown or black gloves, and carried a small handgun in his left hand. He testified that the robber entered the restaurant, took another employee at gunpoint, and went to the drive-through area where he was working. The robber then ordered him to open the register and get on the ground. After removing the money from the drive-through register, the robber took the other employee back to the front of the restaurant, ordered him to open the register, and then ordered him to get on the ground. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark gloves with white markings or letters. The video also depicted the robber walking behind the counter and removing money from the cash register with his right hand while holding a handgun in his left hand.

{¶ 7} On June 28, 2011, a Tim Horton's restaurant at the corner of Sawmill Road and Hard Road was robbed. An employee testified that just before the restaurant closed, at about 10:58 p.m., an African–American man entered the store and got past the counter. The robber had a gun in his left hand; he pointed it at the employee and ordered him to open the cash registers. The employee opened the cash registers and then got on the ground. The robber used his right hand to empty the cash registers. The robber wore dark clothing and black gloves with white markings or letters. The employee testified that he could only see from the top of the robber's nose to his eyebrows because the lower part of his face was covered. He stated that the robber was dark skinned, approximately 5′11″ to 6′0″ tall and "had a little bit of a build to him." (Sept. 25, 2014 Tr. at 194.) A second employee, who was also present during the robbery, testified that the robber walked in carrying a small handgun and demanded money. The robber ordered the two employees to get down on the floor and then made one of them open the cash registers. The second employee testified that he tried to press an alarm button, but the robber came over, pointed the gun at him and told him to stay down. A video from the restaurant's surveillance system was also played for the jury.

{¶ 8} On August 10, 2011, a Subway restaurant at 7558 Worthington–Galena Road was robbed. An employee of the restaurant testified that around 9:30 p.m., as she was preparing to close the restaurant, a man entered and ordered her to give him all the money. The robber jumped over the counter and forced her to open the cash register; he then kneed her in the back and ordered her to get on the ground. The employee testified that the robber wore black clothing, including a black mask, hooded sweatshirt, pants, gloves, and shoes. A video from the restaurant's surveillance system was played for the jury. In the video, the robber can be seen

wearing black gloves with white markings or letters and holding a gun in his left hand while reaching into the cash register with his right hand. The employee testified that the robber was an African–American male who was taller than she was and indicated that her height was 5′6″. She further testified that she was scared during the incident and that shortly thereafter she quit her job because she could not handle working there any longer.

{¶ 9} On the evening of September 11, 2011, a Tim Horton's restaurant at 8333 North High Street was robbed. The employee who was present during the robbery was unavailable at trial due to military service, but the state called the owner/operator of the store as a witness. He testified that he watched the store's surveillance video after the robbery. The surveillance video was played for the jury. In the video, the robber can be seen entering the restaurant and jumping over the counter. The robber wore dark clothing and black gloves with white markings or letters. In the video, a restaurant employee can be seen getting on the floor. The video shows the robber holding a gun in his left hand and using his right hand to reach into the cash register. The state also presented part of the video from earlier that same evening, when an individual appeared to enter the restaurant, go to the restroom and then leave without purchasing anything. That individual appeared to be holding his hands up to shield his face as he walked through the restaurant. The store owner testified that approximately 15 minutes passed between that individual entering and leaving the restaurant and the robbery occurring.

{¶ 10} On September 13, 2011, a BP gas station at 1263 East Dublin–Granville Road was robbed. An employee testified that sometime between 2:00 and 3:00 p.m., a man entered the store with a gun pointed at him and ordered him to open the cash register. The robber told another employee who was present to get on the ground. During the robbery, a customer entered the store and the robber also told him to get on the ground. He testified that the robber wore a mask, a black hooded jacket, and black gloves. He could only see around the robber's eyes, and testified that the robber was a male with light brown skin. The employee testified that the gun was small and the robber held it in his left hand. The store employee testified that following the robbery, the other employee who was present during the robbery quit her job. A video from the store's surveillance system was played for the jury, in which the robber could be seen walking behind the counter while holding a gun in his left hand. In the video, the robber could be seen wearing dark gloves with white markings or letters and using his right hand to reach into the cash register.

{¶ 11} On the evening of September 17, 2011, a Subway restaurant at 1898 Brice Road was robbed. An employee who was present during the robbery testified at trial. She indicated that she was training a new employee on the night of the robbery. When the robber entered the store, the cash register was open because the employee had been counting out money to put in the safe. She heard the robber demand money and looked up to see a gun in her face. She stepped back, leaving the cash register open; the robber jumped over the counter and grabbed the money from inside the register. The robber then made her walk to another part of the

restaurant to prove there was no cash register there. The robber told the other employee to lie down on the floor and not look at him. She testified that the robber was an African–American male with a deep voice, wearing a dark hooded sweatshirt and a bandanna over his mouth area. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark clothes, including dark gloves with white markings or letters. The video depicted the robber jumping over the counter to reach the cash register, while holding a gun in his left hand, and showed him reaching into the cash register with his right hand to remove the money.

{¶ 12} On October 10, 2011, a Marathon gas station at 7200 Sawmill Road was robbed. An employee testified that early in the morning a man entered the store with a gun and declared his intention to rob the store. He then jumped over the counter and ordered the employee to open the cash register. The robber wore black clothing including a hooded sweatshirt, a face mask or ski mask, and gloves. The employee testified he could only see the area around the robber's eyes, and that he was a male with dark skin. He testified that the robber grabbed his collar and punched him in the back when he pressed the panic alarm. The robber held the gun in his left hand and reached into the register with his right hand to remove the money. The employee testified that the robber ordered both employees to get on the ground and departed the store after taking the money. The other employee testified similarly that the robber was an African–American male, approximately 5′7″ to 5′10″ tall, and that he wore black clothing. She stated that the robber pushed her to the ground and ordered her to open the store's safe, but she indicated that she did not have the keys to the safe. A video from the store's surveillance system was played for the jury in which the robber could be seen wearing dark clothing, including dark gloves with white markings or letters, and holding a gun in his left hand. The video showed the robber jumping over the counter to reach the area where the cash registers were located.

{¶ 13} On October 12, 2011, a Family Video store at 5540 North High Street was robbed. An employee testified that at approximately 11:30 p.m., shortly before the store closed, a man entered the store, walked behind the counter, and demanded money. The employee testified that the robber was an African–American male, dressed in all black, including black gloves. She testified that he told her to open the cash registers and then get on the floor. Before she got down, he wrapped his left arm around her; she felt something against her side that she believed was a gun. The robber used his right hand to remove the money from the cash register. She testified that the robber was approximately 5′6″ to 5′7″ tall and weighed 150 to 160 pounds. Photographs taken from the store's surveillance system were presented to the jury. In the photographs, the robber could be seen wearing dark clothing and dark gloves with white markings or letters. The robber was depicted standing behind the counter, holding a gun in his left hand, and using his right hand to remove money from the cash register.

{¶ 14} On October 17, 2011, a McDonald's restaurant at 1300 Morse Road was robbed. The shift manager working that evening testified that, at approximately 7:57 p.m., a man entered the store demanding to speak to the manager. The man then ran behind the counter with a gun drawn and told her to open the cash register. After taking the money, the robber told the manager and the other employees to lie down on the floor. The manager testified that the robber wore black clothes, including a hat, hooded sweatshirt, gloves, and a mask covering the lower part of his face. The robber carried a small handgun in his left hand. The manager testified that the robber was an African–American male, approximately 5′8″ to 5′10″ tall, weighing approximately 180 pounds. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark clothing, including dark gloves with white markings or letters. The robber could also be seen holding a gun in his left hand and running behind the counter to reach the cash registers, where he removed the money with his right hand.

{¶ 15} On November 1, 2011, a BP gas station at 7310 Sawmill Road was robbed. An employee who was present during the robbery testified that at approximately 11:00 p.m., a man entered the store and demanded that his co-worker open the cash registers. The robber demanded that the employee get on the ground, then walked over and shoved him down. The employee testified that the robber wore all black clothing, including a hood and mask covering part of his face, black pants, and black gloves. He could only see part of the robber's face around his eyes, but testified that he was an African–American man with dark skin. He testified that the robber was approximately 5′7″ to 5′8″ tall and weighed approximately 180 pounds. A video from the store's surveillance system was played for the jury. In the video, the robber could be seen wearing dark clothing, including dark gloves with white markings or letters, and carrying a gun in his left hand. The robber could also be seen walking behind the counter and reaching into the cash registers with his right hand after ordering the employee to open them.

{¶ 16} On November 10, 2011, a PNC bank location at 7644 Sawmill Road was robbed. An employee who was present during the robbery testified that at approximately 9:30 a.m., a man entered the bank, jumped over the counter, and demanded cash from her and another teller. She indicated that after opening her cash drawer, the robber reached in to remove the money. She testified that the robber wore black clothing and had something over his mouth so that she could only see the area around his eyes. She testified that the robber was an African–American male with dark skin. The employee testified that the robber ordered everyone in the bank to get on the floor. She testified that the robber appeared to have "a little bit of a bulk to him." (Sept. 29, 2014 Tr. at 490.) Photographs taken from the bank's surveillance system were presented to the jury, in which the robber could be seen entering the bank dressed in all black, including a mask and hooded sweatshirt. In the photos, the robber can be seen jumping over the counter and he appears to be holding a small handgun in his left hand. The photos also show the robber wearing dark gloves with white markings or letters.

## B. Investigation of 2011 Robberies

{¶ 17} Former Columbus Police Detective Gregory Franken testified that he was assigned to a joint investigative team with Special Agent Craig Brennaman of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The purpose of the joint investigative team was to investigate armed serial robberies. Detective Franken was involved in the investigation of the series of robberies that occurred in 2011; investigators came to refer to the suspect in those crimes as the "counter jumper." (Sept. 30, 2014 Tr. at 828.) He testified he developed approximately one dozen potential suspects for the robberies. Detective Franken testified that he began to investigate appellant as a potential suspect in mid-to-late November 2011; part of that investigation involved using GPS tracking devices on appellant's vehicles. No crimes attributed to the "counter jumper" robber were committed during this initial period of GPS surveillance. Special Agent Brennaman testified similarly that he was involved with investigating the series of robberies committed in 2011. He testified that at some point in the investigation, cell phone records for appellant were obtained and examined to determine whether appellant was in the applicable areas at around the times of the 2011 robberies. The state also introduced evidence from appellant's driver's license indicating that he was 5′ 9″ tall and weighed 222 pounds.

## C. November 8, 2012 Wendy's Robbery

{¶ 18} On November 8, 2012, a Wendy's restaurant at 1500 Worthington Woods Boulevard was robbed. A manager who was present during the robbery testified that at approximately 9:00 p.m., a man entered the restaurant dressed in all black, including black gloves. He pointed a gun at her head and told the employees to get down on the floor. The robber went behind the counter and made the manager open the cash registers. The manager testified that after taking the money the robber left the restaurant; one of the employees ran after him, but the robber turned and pointed the gun at him and told him to stop running. The manager testified that the robber was approximately 5′7″ and weighed about 200 pounds. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark gloves with white markings or letters, and holding a gun in his left hand while using his right hand to reach into the cash register.

{¶ 19} Appellant presented a witness to the November 8, 2012 Wendy's robbery who testified that he was parked outside the restaurant eating a sandwich on the evening of the robbery. He saw an individual dressed in dark clothing jog past his car toward a nearby muffler shop. He then heard screaming from Wendy's and watched the individual get into a burgundy late–1990s or early 2000 Astro van parked near the muffler shop. On cross-examination, this witness admitted that he gave a statement to the police indicating that the van was a "maroon, rusty green or dark colored Astro-like van." (Sept. 29, 2014 Tr. at 547.)

{¶ 20} The prosecution also presented testimony from Detective Chris Davis of the Westerville Police Department. Detective Davis testified that he was a patrol officer at the time of the November 8, 2012 Wendy's robbery. After hearing the robbery-in-progress call, he began to drive his patrol cruiser toward the area. His patrol cruiser was equipped with a license plate reader camera. Detective Davis testified that the license plate reader on his cruiser identified license plate number ERR6711 at 9:07 p.m. on South Cleveland Avenue in the area in front of St. Ann's Hospital. He testified that this location was approximately 2 .7 miles from the Wendy's location that was robbed on November 8, 2012.

{¶ 21} Detective Franken testified that following the November 8, 2012 Wendy's robbery, members of the Columbus police contacted the Westerville Police Department and received the license plate reader information described by Detective Davis. As a result of that information, Detective Todd Cress of the Columbus Division of Police prepared an affidavit in support of a second GPS tracking warrant for appellant's vehicles, a black 2004 Dodge Stratus with the license plate number BIGNEIL, and a blue 1995 Ford Aerostar van with the license plate number ERR6711. The affidavit was presented to a judge of the Franklin County Municipal Court and the installation of GPS devices was authorized at 1:13 a.m. on November 9, 2012.

D. November 15, 2012 Bureau of Motor Vehicles Office Robbery

{¶ 22} On November 15, 2012, an Ohio Bureau of Motor Vehicles office ("BMV office") at 112 Dillmont Drive was robbed. The state presented testimony from two employees of the BMV office and a customer who were present at the time. One of the employees testified that the office closed at 6:30 p.m. Near closing time on November 15, 2012, a man rushed through the door and demanded money. The robber wore a sweatshirt and track pants, a black mask, gloves, and dark shoes. The employee testified that he pointed a small gun at her as he demanded money. She testified that the robber walked behind the counter; she handed him money and then he also grabbed money from another employee. When the office manager emerged from the back room of the office, the robber pointed the gun at her and told her to sit down. The employee testified that the robber was an African–American man, and that he held the gun in his left hand. The other employee testified similarly that the robber ran into the office demanding money and telling the employees to keep their heads down. She testified that the robber was an African–American man, dressed in black clothing, including a hood, mask, and gloves. The customer who was present in the BMV office likewise testified that the robber wore a mask and gloves, and pointed a small handgun at the employees. The prosecution also presented a video of the robbery, taken from the BMV office's surveillance system. In the video, the robber could be seen dressed in dark clothing, wearing a mask and dark gloves with white markings or letters. The robber held a gun in his left hand and went behind the counter of the BMV office, but instead of reaching into cash registers, he took money directly from the employees who handed it to him.

{¶ 23} Officer Howard Brenner, a member of the Columbus Division of Police SWAT team, testified that he was assigned to follow appellant on the evening of November 15, 2012. He ultimately located appellant's Dodge Stratus parked in a lot near the BMV office, but appellant was not in the vehicle. He then observed an individual matching appellant's description, wearing a dark cap, dark clothes, and shiny tennis shoes walking along Dillmont Road. Officer Brenner testified he saw that same individual, later identified as appellant, run into the BMV office just as the "open sign" was turned off. (Sept. 29, 2014 Tr. at 642.) Officer Brenner watched as appellant entered the BMV office, moved past the counters, and committed the robbery. Officer Brenner testified that he saw appellant confront the clerks at the BMV office while holding a gun. Officer Brenner and other SWAT officers pursued appellant after he left the BMV office, ultimately arresting appellant after he attempted to flee.

{¶ 24} Detective Franken interrogated appellant following his arrest, along with Columbus Police Detective Dana Farbacher. A videotape of the interrogation, with certain redactions as stipulated by the parties, was played for the jury. During the interrogation, appellant admitted he robbed the BMV office. Appellant stated that "I just figured if I could just get 1,400, I mean, I know how the old saying goes, you know, I'm going to quit, I'm going to quit, you know what I'm saying." (Sept. 30, 2014 Tr. at 719.) Appellant repeatedly denied committing any other robberies; however, he also stated that "I understand it becomes habitual, you know, especially if you get away." (Sept. 30, 2014 Tr. at 728.) During the interrogation, appellant was shown a photographic image taken from the surveillance video at the Tim Horton's that was robbed on September 11, 2011. However, the interrogating detectives did not tell appellant the source of the photograph. When asked what the photograph looked like, appellant responded "[t]hat's my van." (Sept. 30, 2014 Tr. at 734.) Appellant later reiterated, "I'm not going to sit here and tell you that that is not my van, you know, you showed me a picture of my car, you showed me a picture of my van. I'm going to know it." (Sept. 30, 2014 Tr. at 760.)

{¶ 25} When asked about his whereabouts on November 8, 2012, appellant stated he was driving his van that evening and that, after working out at a fitness center in Worthington, he went to the home of one of his personal training clients located in Hilliard. Appellant was inconsistent in describing when he arrived at his client's home; at various times he referred to his arrival time as around 8:30 p.m. or as sometime after 9:00 p.m. He stated that he remained at the client's home until around 10:00 or 10:30 p.m. Appellant further stated that after leaving his client's home, he ran out of gas near Interstates 270 and 71 and his wife had to bring him a gas can so that he could refill the vehicle. When asked how his van's license plate could have been detected on a license plate reader from a Westerville police department cruiser on Cleveland Avenue, near the area of St. Ann's Hospital at 9:07 p.m., appellant reiterated that he traveled from Worthington to Hilliard and then returned home.

E. Jury Verdicts and Sentencing

{¶ 26} At the close of trial, appellant's counsel moved to dismiss all charges under Crim.R. 29. The trial court granted appellant's motion with respect to Count 6 in case No. 12CR–5963, because the victim named in that kidnapping count was not specifically identified by the employee who testified about the November 8, 2012 Wendy's robbery.

The jury found appellant guilty of all remaining charges: 4 counts of robbery and 5 counts of kidnapping in case No. 12CR–5963, and 26 counts of robbery and 1 count of kidnapping in case No. 13CR–4174. On October 29, 2014, the trial court conducted a sentencing hearing. On October 31, 2014, the trial court issued judgment entries in both cases, concluding that certain charges merged for purposes of sentencing and that certain portions of the sentence were to be served consecutively with each other, for a total sentence of 42 years imprisonment.

## II. ASSIGNMENTS OF ERROR

{¶ 27} Appellant appeals from the trial court's judgments, assigning six errors for this court's review in a brief filed by counsel:

[I.] THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW WHEN POLICE OFFICERS WERE ALLOWED TO INDICATE THEIR BELIEFS THAT THE IMAGES OF THE SUSPECT OR SUSPECTS IN THE OTHER ROBBERIES WERE THAT OF THE DEFENDANT AND THAT THEY WERE CERTAIN THAT ALL THE OFFENSES WERE COMMITTED BY THE SAME DEFENDANT AND BY THE INTRODUCTION OF INADMISSIBLE COMMUNITY AND VICTIM IMPACT EVIDENCE.

[II.] THE TRIAL COURT ERRED WHEN IT JOINED THE TWO INDICTMENTS FOR TRIAL WHEN THE JOINDER WAS EXTREMELY PREJUDICIAL TO THE DEFENDANT AND THE STATE WAS UNABLE TO ESTABLISH THAT THE EVIDENCE OF THE ONE OFFENSE WOULD HAVE BEEN ADMISSIBLE TO SHOW A MODUS OPERANDI INDICATIVE OF A BEHAVIORAL FINGERPRINT OR UNIQUE, SIGNATURE–LIKE MANNER OF COMMITTING THE OTHER OFFENSES.

[III.] THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY, OVER THE DEFENDANT'S OBJECTION, THAT THEY COULD CONSIDER THE ACTS OF THE DEFENDANT IN ONE INSTANCE TO PROVE IDENTITY IN THE OTHER INCIDENTS.

[IV.] THE DEFENDANT DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION WHEN COUNSEL FAILED

TO OBJECT TO IMPROPER POLICE OFFICER OPINIONS OF THE DEFENDANT'S GUILT, PREJUDICIAL AND IRRELEVANT VICTIM IMPACT EVIDENCE, AND FAILED TO HAVE A RECORD MADE OF THE JOIN[D]ER HEARING.

[V.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

[VI.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 28} Appellant also submitted a pro se supplemental brief, assigning five additional errors for this court's review:

[VII.] The Trial Court erred by not addressing the first search warrant and allowing testimony of information not within the four corners of the affidavit nor made part of the record during issuance to rehabilitate the lack of veracity and basis of knowledge upon which the affiant based his subjective beliefs, which do not support probable cause nor a good faith reliance. The Trial court abused its discretion giving weight to the extraneous testimony and counsel was ineffective under Strickland for not objecting to such testimony.

[VIII.] The Trial Court erred by refusing to acknowledge and address that detective Todd Cress knowingly, and intentionally, with reckless disregard for the truth, did not inform the second judge, nor referenced his intent to reuse and incorporate the uncorroborated information from the fruitless January affidavit with appropriate words of incorporation, at all. Knowing uncorroborated information does not support probable cause. Thus, it cannot legally be part of the November 9th, 2012 affidavit and must be excised.

[IX.] The Trial Court erred by not finding that the misleading "new indicia" provided by witness Troy Huff was falsified by detective Todd Cress in bad faith having the signed hand written statements in possession. The trial court [']s application of the good faith exception under these circumstances, resulted as in 28 USCS § 2254, "a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the United States, and a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," permitting a false statement to justify it.

[X.] The January affidavit, illegally incorporated under false pretenses, without informing the judge, and the misleading and falsified statement of Troy Huff, should then be excised or set aside. With the affidavit's material set to one side, the affidavit's remaining content is insufficient to establish probable cause for the

warrant to issue, and the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. State v. Hunt, 22 Ohio App.3d 43, at 903, citing Franks v. Delaware.

[XI.] Counsel was Ineffective Assistance in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution for failing to raise the following Fourth Amendment violations.

(*Sic* passim.)

*State v. Neil*, 10th Dist. Nos. 14AP-981, 15AP-594, 2016 WL 3574549, at *1-10 (Ohio Ct. App. June 30, 2016). On June 30, 2016, the appellate court affirmed the judgment of the trial court. *Id*. On January 25, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Neil*, 147 Ohio St.3d 1506 (Ohio 2017). On October 2, 2017, the United States Supreme Court denied the petition for a writ of *certiorari. Neil v. Ohio*, 138 S.Ct. 124 (2017).

On September 27, 2016, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), asserting that his attorney improperly failed to raise on appeal claims of ineffective assistance of trial counsel due to the failure to present exculpatory identification evidence and the denial of his right to be present at the joinder hearing. (ECF No. 21-1, PAGEID #1073-74.) On February 2, 2017, the appellate court denied Petitioner's Rule 26(B) application. (PAGEID # 1071.) Petitioner states that he never received notification of the appellate court's decision denying his Rule 26(B) application and therefore filed a motion for relief from judgment. (*See Opposition to Denial of Stay And Abeyance and Motion to Amend/Supplement*, ECF No. 20, PAGEID # 200-201.) On September 6, 2017, the appellate court issued a Journal Entry *sua sponte* striking that motion as improper. (ECF No. 21-1, PAGEID # 1078.) Petitioner filed a timely Notice of Appeal. (PAGEID # 1080.) On December 20, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (PAGEID #

1093.)  On February 28, 2018, the Ohio Supreme Court denied Petitioner's motion for reconsideration.  (PAGEID # 1104.)

Petitioner pursued other state collateral relief.  On February 3, 2016, he filed a petition for post conviction relief in the state trial court, asserting that he had been denied the effective assistance of trial counsel because his attorney failed to subpoena witnesses or submit exculpatory evidence for the defense.  On October 31, 2016, the trial court denied the post conviction petition as untimely.  On June 25, 2019, the appellate court affirmed the judgment of the trial court.  *State v. Neil*, 10th Dist. No. 18AP-609, 18AP-610, 2019 WL 2602564 (Ohio Ct. App. June 25, 2019).  Petitioner filed a timely appeal to the Ohio Supreme Court.  (ECF No. 21-2, PAGEID # 1320.)  On October 15, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  (ECF No. 27-1, PAGEID # 3274.)

{¶ 8} On August 1, 2018, appellant filed a successive petition for post-conviction relief. On August 28, 2018, the state filed an answer and motion to dismiss the petition.

{¶ 9} By decision and entry filed December 7, 2018, the trial court denied appellant's petition to vacate or set aside his judgment of conviction or sentence. In its decision, the trial court found appellant's second petition for post-conviction relief to be untimely as to both case Nos. 12CR-5963 and 13CR-4174, and further found none of the exceptions for an untimely petition to be applicable.

{¶ 10} On appeal, appellant, pro se, sets forth the following five assignments of error for this court's review:

Assignment of error one: Appellant was deprived of his fundamental right to be free from illegal search and seizure in violation of the Fourth Amendment to the United States and Ohio Constitution, where police officers did not obtain a search warrant supported by probable cause for appellant's cell-site location information, then misleadingly and falsely presented the CSLI in two other search warrants which also contained multiple omissions, misleading, and false statements, then presented at trial prejudicing and depriving appellant of a fair trial.

Assignment of error two: Appellant was deprived of his fundamental right to due process and a fair trial in violation of the Sixth Amendment to the United States and Ohio Constitution, due to prosecutorial misconduct where the prosecutor

13

submitted false testimony that he knew was false which clearly affected the judgment of the jury to convict appellant.

Assignment of error three: Appellant was deprived of his fundamental right to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States and Ohio Constitution when trial counsel ineffectively deprived appellant from presenting evidence and subpoenaing witnesses in his favor.

Assignment of error four: The cumulative effect of these errors deprived appellant of his fundamental right to fair trial in violation of the Sixth Amendment to the United States and Ohio Constitution.

Assignment of error five: The trial court erred and abused its discretion when it denied appellant's 2953.23 petition denying appellant due process and a fair trial free from false statements from law enforcement and the prosecutor that went directly towards guilt.

*State v. Neil*, -- N.E.3d --, --, 10th Dist. Nos. 18AO-1001, 18AP-1003, 18AP-1004, 2019 WL 4547078, at *1-2 (Ohio Ct. App. Sept. 19, 2019). On September 19, 2019, the appellate court affirmed the judgment of the trial court. *Id*. It does not appear from the record that Petitioner pursued an appeal to the Ohio Supreme Court.

On March 7, 2019, Petitioner filed this *pro se* habeas corpus petition. He asserts as follows:

1. The trial court erred when it joined the two indictments for trial when the joinder was extremely prejudicial to the defendant and the State was unable to establish that the evidence of the one offense would have been admissible to show a modus operandi indicative of a behavioral fingerprint or unique, signature-like manner of committing the other offenses.

2. The defendant was deprived of his right to a fair trial and due process of law when police officers were allowed to indicate their beliefs that the images of the suspect or suspects in the other robberies were that of the defendant and that they were certain that all the offenses were committed by the same defendant and by the introduction of inadmissible community and victim impact evidence.

3. The defendant did not receive effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I, of the Ohio Constitution when counsel failed to object to improper police officer opinions of the defendant's guilt, prejudicial and irrelevant victim impact evidence, and failed to have a record made of the joinder hearing.

4. The trial court erred when it instructed the jury, over the defendant's objection, that they could consider the acts of the defendant in one instance to prove identity in the other incidents.

5. The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain the convictions.

6. The trial court erred when it entered judgment against the defendant against the manifest weight of the evidence.

7. Ineffective assistance of appellate counsel in his failure to raise ineffective assistance of trial counsel in denial of his right to present exculpatory identification evidence in his favor after cross-examination of a witness, nor during closing arguments.

8. Ineffective assistance of appellate counsel for failure to raise ineffective assistance of trial counsel in denial of his right to present exculpatory evidence from the 2013 robberies, the unique clothing and glove differences, and the trial court's abuse of discretion for not examining and admitting evidence in his favor at trial previously submitted and accepted at the suppression hearing by the same judge.

9. Ineffective assistance of appellate counsel in his failure to raise that the court violated defendant's right to "defend in person and with counsel" and "must be physically present at every stage of the criminal proceeding," pursuant to Crim.R. 43 as guaranteed in all felony cases under Article I, Section 10 of the Ohio Constitution, in an assignment of error.

10. The trial court erred by not addressing the first search warrant and allowing testimony of information not within the four corners of the affidavit nor made part of the record during issuance to rehabilitate the lack of veracity and basis of knowledge upon which the affiant based his subjective beliefs, which do not support probable cause nor a good faith reliance. The trial court abused its discretion giving weight to the extraneous testimony and counsel was ineffective under Strickland for not objecting to such testimony.

11. The trial court erred by refusing to acknowledge and address that Detective Todd Cress knowingly and intentionally, with reckless disregard for the truth, did not inform the second judge, nor referenced his intent to reuse and incorporate the uncorroborated information from the fruitless January affidavit with appropriate words of incorporation, at all. Knowing uncorroborated information does not support probable cause. Thus, it cannot legally be part of the November 9th, 2012 affidavit and must be excised.

12. The January Affidavit, illegally incorporated under false pretenses, without informing the judge, and the misleading and falsified statement of Troy Huff, should then be excised or set aside with the affidavit's material set to one side, the

affidavit's remaining content is insufficient to establish probable cause for the warrant to issue, and the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. . . .

13.  The trial court erred by not finding that the misleading "new indicia" provided by witness Troy Huff was falsified by Detective Todd Cress in bad faith having the signed hand written statements in possession.  The trial court's application of the good faith exception under these circumstances resulted as in 28 U.S.C. §2254, "a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the United States, and a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," permitting a false statement to justify it.

14.  Counsel was ineffective assistance [sic] in violation of the Sixth Amendment. . . for failing to raise [] Fourth Amendment violations.

15.  Petitioner was denied the effective assistance of counsel due to counsel's failure to subpoena alibi witnesses, other defense witnesses, and exculpatory evidence, which caused the [defendant] to suffer prejudice, in violation of the Sixth Amendment.

16.  The cumulative effect of these errors deprived Petitioner of his fundamental right to a fair trial in violation of the Sixth Amendment to the United States and Ohio Constitution.

17.  Petitioner was deprived of his fundamental right to be free from illegal search and seizure in violation of the Fourth Amendment to the United States and Ohio Constitution, where police officers did not obtain a search warrant supported by probable cause for Petitioner's cell-site location information, then misleadingly and falsely presented the CSLI in two other search warrants which also contained multiple omissions, misleading, and false statements, then presented it at trial prejudicing and depriving the Petitioner of a fair trial.

18.  Petitioner was deprived of his fundamental right to due process and a fair trial in violation of the Sixth Amendment to the United States and Ohio Constitution, due to prosecutorial misconduct where the prosecutor submitted false testimony that he knew was false which was overwhelming evidence that caused the Petitioner's conviction.

19.  Petitioner was deprived of his fundamental right to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States and Ohio Constitution when trial counsel ineffectively deprived the defendant from presenting evidence and subpoenaing witnesses in his favor. (same as 15)

20.  The cumulative effect of these errors deprived the defendant of his fundamental right to a fair trial in violation of the sixth Amendment to the United States and Ohio Constitution.

It is the position of the Respondent that Petitioner's claims are procedurally defaulted or without merit.

## II.  Procedural Default

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a).  In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).  If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir.

2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. As the Supreme Court found in *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id.*

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)). That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). Or, if procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." Id., at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In

such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].'" *Id.*, at 854, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

## III. Application

### a. Claim Two

In claim two, Petitioner asserts that he was denied a fair trial based on admission of opinion testimony by police indicating they believed that the same perpetrator, *i.e.*, the Petitioner, committed all of the robberies charged, and introduction of inadmissible community and victim impact evidence. The state appellate court reviewed this claim for plain error only, due to Petitioner's failure to object:

> {¶ 70} Appellant argues in his first assignment of error that he was deprived of due process and his right to a fair trial when the trial court admitted opinion testimony from police officers and victim impact testimony. Appellant asserts that police officers were improperly allowed to testify at trial as to their opinions regarding appellant's guilt; he further asserts that portions of an interrogation video that was played for the jury contained improper opinion and hearsay statements from the interrogating police officers. Appellant also argues that the trial court erred by admitting victim impact testimony that was inflammatory and prejudicial. We will consider each of appellant's arguments in turn.

{¶ 71} Generally, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006–Ohio–2815, ¶ 62. Pursuant to Evid.R. 701, a witness who has not been qualified as an expert may testify as to opinions that are "(1) rationally based on the perception of the witness[,] and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." A trial court has broad latitude in allowing or controlling lay witness opinion testimony. We will not overturn a trial court's decision concerning such testimony absent an abuse of discretion and a demonstration that the abuse of discretion materially prejudiced the objecting party. *State v. Bond*, 10th Dist. No. 11AP–403, 2011–Ohio–6828, ¶ 14.

{¶ 72} Appellant specifically cites trial testimony from Detective Davis, Detective Franken, and Special Agent Brennaman regarding the joint investigation into the serial robberies. After explaining that he had shared information with representatives from the Columbus Division of Police, ATF, Reynoldsburg Police Department, and other agencies, Detective Davis was asked whether he reached any conclusions from his comparison of videos and surveillance photos from the various robberies. As the state notes, appellant's counsel objected to the question at trial, and the trial court sustained the objection. After additional description of the collective efforts of the law enforcement agencies, Detective Davis testified that he observed common characteristics across the robberies, including the suspect's clothing, physical characteristics, method of operation upon entering the premises, type of weapon used, and hand the weapon was carried in. Similarly, Detective Franken testified that he investigated the series of robberies, which he believed were linked, and developed approximately one dozen suspects. Detective Franken further testified that he believed that if he could link a suspect to one of the robberies, he would have identified the culprit in all of the crimes. Special Agent Brennaman testified that he worked with Detective Franken on multiple serial robbery cases, including the investigation of the 2011 robberies.

{¶ 73} Notably, the trial testimony cited in appellant's brief did not involve the law enforcement officers offering opinions about appellant's guilt but, rather, about whether all of the robberies were committed by a single suspect. Additionally, we note that, other than the objection discussed above that was sustained by the trial court, appellant's counsel did not object to this testimony at trial. Because there was no objection, appellant waived all but plain error as to this testimony. *State v. Noor*, 10th Dist. No. 13AP–165, 2014–Ohio–3397, ¶ 56 ("[T]he record reflects that no contemporaneous objection was made either to the prosecutor's questions or to the officers' answers. We must determine, therefore, whether it was plain error to allow this testimony."). Plain error involves an obvious error or defect in the proceedings that affects a substantial right; reversal is warranted only if the outcome of the trial clearly would have been different absent the error. *Id.*

{¶ 74} To the extent Detectives Davis and Franken, and Special Agent Brennaman offered opinion testimony, it was admissible lay opinion testimony under Evid.R. 701. The cited portion of Special Agent Brennaman's testimony does not appear to contain opinion testimony—he simply testified that he was involved in an investigation in which the Columbus police believed the robberies were linked. Detective Davis's testimony was clearly based on his own perceptions because he testified that he reached his conclusions based on his review of the video and photographic evidence. Likewise, Detective Franken testified that he reviewed the surveillance videos from the robbery incidents. Testimony from both Detectives Davis and Franken was helpful to the jury's understanding of each witness's testimony regarding the investigatory process. It also assisted the jury in determining a fact in issue, *i.e.*, the identity of the suspect in the robberies. Therefore, admission of this testimony did not constitute plain error.

{¶ 75} Appellant asserts that the most damaging evidence was introduced through the interrogation video that was played for the jury. Appellant cites to statements from Detectives Franken and Farbacher during the interrogation asserting that they believed appellant was involved in the 2011 robberies and that they had surveillance videos and cell phone records to prove that appellant committed those crimes. Appellant argues that these statements constituted hearsay and that they were improper opinion evidence because the detectives expressed their opinions that appellant was guilty of the robberies. Prior to introduction of the interrogation video at trial, appellant's attorney indicated there was a stipulation with respect to the video and that it had been edited and redacted to remove certain content. Thus, the state argues that because the parties agreed to redact certain portions of the video, any alleged error arising from admission of the remaining portions of the video could be considered invited error. "Under the 'invited error' doctrine, a party may not take advantage of an error which he invited or induced." *State v. Griffin*, 10th Dist. No. 10AP–902, 2011–Ohio–4250, ¶ 16. "Pursuant to this doctrine, a party cannot claim that a trial court erred by accepting the party's own stipulation." *State v. McClendon*, 10th Dist. No. 11AP–354, 2011–Ohio–6235, ¶ 37.

{¶ 76} Even if admission of the interrogation video does not constitute invited error, it would be subject to review under the plain error standard because appellant's counsel did not object to introduction of the non-redacted portions of the video. With respect to appellant's hearsay argument, we conclude that the detectives' statements in the interrogation video did not constitute hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In the context of the trial proceedings, it appears that the purpose of including the detectives' statements in the portions of the interrogation video played for the jury was to provide context for appellant's statements and admissions during the interrogation. *See, e.g., State v. Woods*, 10th Dist. No. 05AP–704 (Aug. 17, 2006) ("[T]he testimony of [Detective] Junk about Dickson's statement regarding appellant's location on the morning of the robbery and the videotape of Junk relaying Dickson's statement to appellant during the interview, were not hearsay as

they were not offered for the truth of the matter asserted. Instead, they were offered to explain the context behind why appellant first claimed to Junk that he had an alibi, but later recanted his story and offered to 'let it all out,' and tell Junk that Koonts allegedly gave him money to purchase cocaine."); *State v. Rice*, 11th Dist. No.2009–A0034, 2010–Ohio–1638, ¶ 23 ("The focus or purpose of playing the tape was to show Mr. Rice's voluntary confession. Thus, the statements made by the detectives were not intended to improperly interject medical 'expert testimony' as to the cause of death as Mr. Rice contends. Rather, the statements were an interrogation technique employed to elicit a response from Mr. Rice."). Moreover, assuming for purposes of analysis that the portions of the video in which the detectives expressed their opinion that appellant was involved in all the robberies would constitute impermissible opinion testimony, appellant has failed to demonstrate plain error by showing that the outcome of the trial clearly would have been different had those statements not been presented to the jury. Appellant asserts that it was the most damaging evidence against him, but there was a substantial volume of evidence presented against appellant, including his own admission to the BMV office robbery and his attempt to explain his whereabouts when the license plate reader identified his van near the location of the November 8, 2012 Wendy's robbery, as well as the testimony and evidence establishing the similarities between those robberies and the 2011 robberies.

{¶ 77} Appellant further argues that the trial court erred by admitting victim impact testimony during the guilt phase of the trial. Appellant claims that this evidence was not relevant to determining whether appellant committed the robberies and only served to invoke the jury's sympathy for the victims and make the jurors more likely to convict him. Appellant cites to several specific instances of alleged victim impact testimony. The witness regarding the August 10, 2011 Subway robbery testified that she had a two-year-old child at the time of the robbery and that, following the robbery, she stopped working for Subway because she was afraid to work alone. The witness regarding the September 13, 2011 BP robbery testified that his co-worker got down on the floor crying after the robbery and quit her job immediately after the robbery. The witness regarding the September 17, 2011 Subway robbery testified that her co-worker, who was a new employee, was laying on the floor crying after the robbery. She testified that they both decided that Subway was not a good place to work, and that the new employee quit after the robbery. She further stated that she did not know if her former co-worker would ever get a job again. The witness to the October 10, 2011 Marathon robbery testified that both he and his co-worker were very upset following the robbery. The employee who testified about the November 8, 2012 Wendy's robbery stated that she was so frightened during the robbery that she urinated on herself. She further testified that during the robbery she tried to stay calm so the robber would not hurt one of her co-workers, who was seven months pregnant at the time. One of the employees present during the November 15, 2012 BMV office robbery testified that she was concerned for her daughter, who was a co-worker and was present during the robbery, because she was five months pregnant at the time and had lost a child the prior year. She testified that her daughter was very upset and crying after

the robbery and that she asked whether her daughter wanted an ambulance to be called. The daughter also testified, stating that her first instinct during the robbery was to get down on the floor to protect her unborn child. Appellant also cites to comments by Detective Franken regarding the impact on the victims that were included in the interrogation video presented to the jury.

{¶ 78} This court has recognized that testimony as to the effect of a criminal act on the victim, the victim's family, or both, is usually not considered relevant evidence with regard to the guilt or innocence of the defendant. *State v. F.R.*, 10th Dist. No. 14AP–440, 2015–Ohio–1914, ¶ 45. Victim impact testimony creates a risk of inflaming the passions of the jury and resulting in a conviction on facts unrelated to the defendant's guilt or innocence. *Id*. However, "[e]vidence relating to the facts attendant to the offense is 'clearly admissible' during the guilt phase, even though it might be characterized as victim-impact evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005–Ohio–6046, ¶ 98, citing *State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995).

{¶ 79} The F.R. case involved a prosecution for gross sexual imposition against an 11–year–old victim. F.R. at ¶ 2–3. On appeal, the defendant argued in part that the trial court erred by allowing the prosecution to elicit testimony about the psychological harm suffered by the victim and her family. *Id*. at ¶ 42. The prosecutor asked the victim's mother what impact the incident had on the family. Over objection by defense counsel, the trial court permitted the testimony to proceed and the witness testified that there had been a lot of tears and uneasiness in the neighborhood, along with having conversations with her son about why the family was careful. *Id*. at ¶ 43. This court found that the testimony was not relevant to the defendant's guilt or innocence and that the only apparent purpose for the question was to elicit sympathy from the jury. Accordingly, the court found that the trial court erred by admitting the testimony; however, the court further concluded that the error was harmless because there was no reasonable possibility it contributed to the conviction. *Id*. at ¶ 46. The court noted that the prosecutor did not dwell on the impact of the crimes during questioning or in closing argument. *Id*. at ¶ 47. The court contrasted the facts with those present in *State v. Presley,* 10th Dist. No. 02AP–1354, 2003–Ohio–6069, where a rape victim testified that she suffered nightmares about the rape and both the victim and her mother testified that the victim attempted suicide as a result of the rape. F.R. at ¶ 48. The *Presley* court concluded that the trial court abused its discretion by admitting that testimony which prejudiced the defendant. *Presley* at ¶ 86. Because the F.R. court found that there was "no reasonable possibility that the limited victim impact testimony contributed to [the defendant's] conviction," it overruled his challenge to the victim impact testimony. F.R. at ¶ 48.

{¶ 80} In the present case, appellant concedes that his trial counsel did not object to the purported victim impact testimony. Therefore, we apply the plain error standard. With respect to the statements of Detective Franken contained in the interrogation video, we apply the same reasoning set forth above—*i.e.,* the

statements provided context for the interrogation and appellant's responses and they were not offered to prove the truth of the matter asserted. With respect to the trial testimony cited by appellant, it seems clear that the testimony from employees of the various businesses that were robbed was not directly relevant to appellant's guilt or innocence and there was some risk that this testimony would inflame the sympathies of the jury. The evidence appears to be more substantial than the testimony deemed to be harmless in F.R., but less detailed and emotional than the improper testimony in *Presley*. Moreover, in determining whether admission of this testimony constituted plain error, the entire context of the trial must be considered. The trial lasted six days and involved testimony from 30 witnesses relating to 15 separate robberies; the printed transcript of the trial spans 6 volumes and nearly 1200 pages of testimony and argument. Thus, while the various statements cited in appellant's brief may appear to create a notable risk of prejudice to appellant when compiled into a single paragraph, we must consider that the jury heard them as individual comments by certain witnesses throughout the course of a six-day trial. Absent the victim impact statement, the jurors would still have been provided with voluminous evidence including descriptions and video or photographic evidence related to each robbery, as well as appellant's statements during his interrogation. Under these circumstances, we conclude that appellant has failed to show that the outcome of his trial clearly would have been different had the victim impact testimony not been admitted; accordingly, admission of this testimony did not constitute plain error.

{¶ 81} Finally, we note that appellant generally argues in support of his first assignment of error that the prosecution relied on the opinion testimony and victim impact testimony in its closing argument. Appellant claims that the jury must have necessarily relied on this testimony in convicting him because the jurors deliberated for less than one hour before reaching final verdicts on all charges. We conclude, however, the jury's relatively brief deliberation does not necessarily mean their verdicts were based on emotion. Although there was voluminous evidence and testimony presented in this case, as discussed more fully below in response to appellant's weight and sufficiency challenges, the evidence as to each robbery was largely straightforward and direct. The key issue for the jury was identity with respect to the 2011 robberies and the November 8, 2012 Wendy's robbery, and whether the state had established sufficient similarities between those crimes and the November 15, 2012 BMV office robbery where appellant was arrested. It is conceivable that the jurors quickly reached a consensus on this issue by reviewing the evidence and testimony presented to them.

{¶ 82} Accordingly, we overrule appellant's first assignment of error.

*State v. Neil*, 2016 WL 3574549, at *21-26.

Again, in claim two, Petitioner asserts that he was denied a fair trial based on opinions and statements that were admitted but about which he did not object during the trial. Petitioner

has, therefore, procedurally defaulted claim two for review in these proceedings. *See Norton v. Sloan*, No. 1:16-cv-854, 2017 WL 525561, at *12 (N.D. Ohio Feb. 9, 2017) (citing *Durr v. McLaren*, No. 15-1346, 2015 WL 5101751, at *2 (6th Cir. Aug. 28, 2015)). The United States Court of Appeals for the Sixth Circuit has held that Ohio's contemporaneous-objection rule constitutes an adequate and independent state ground to preclude federal habeas review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334-35 (6th Cir.) (citation omitted), *cert. denied sub nom. Wogenstahl v. Robinson*, 568 U.S. 902 (2012); *Awkal v. Mitchell*, 613 F.3d 629, 648-49 (6th Cir. 2010)*, cert. denied*, 562 U.S. 1183 (2011). The state appellate court's plain error review does not constitute a waiver of the state's procedural default rules. *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006), *cert. denied sub nom. Keith v. Houk*, 549 U.S. 1308 (2007).

**b**. **Claims Fifteen and Nineteen**

In claims fifteen and nineteen, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to subpoena alibi witnesses and other defenses or introduce other exculpatory evidence. Petitioner presented this claim in the first instance in his February 3, 2016, petition for post conviction relief. (ECF No. 21-1, PAGEID # 1105.) However, the state appellate court affirmed the trial court's dismissal of that action as untimely:

> {¶ 16} As noted under the facts, although appellant filed his petition under case No. 12CR-5963, the trial court deemed the petition filed under both case Nos. 12CR-5963 and 13CR-4174. The record indicates the transcripts in case No. 12CR-5963 were filed on February 2, 2015. Appellant filed his petition in case No. 12CR-5963 on February 3, 2016, one day after the statutory deadline expired.

> {¶ 17} Appellant contends that supplemental transcripts were filed in case No. 12CR-5963 on April 27, 2015, thereby extending the time in which to file his petition for post-conviction relief. We note that the supplemental transcripts (two volumes) at issue pertain to the pre-trial suppression hearing in that case. According to appellant, the filing of the supplemental transcripts (on April 27, 2015) provided

him "a deadline of on or about April 27, 2016 to file his post-conviction petition which would deem the February 3, 2016 filing as timely." (Appellant's Brief at 5.)

{¶ 18} Ohio courts, however, have held that "the supplementation of the record is irrelevant" for purposes of the time limit for petitions for post-conviction relief set forth in R.C. 2953.21. *State v. Rice*, 11th Dist. No. 2010-A-0046, 2011-Ohio-3746, ¶ 26. *See also State v. Durham*, 8th Dist. No. 98044, 2012-Ohio-4165, ¶ 5 (appellant's filing of supplemental record in direct appeal "did not extend the time in which to file the petition for postconviction relief"); *State v. Wilson*, 6th Dist. No. L-13-1210, 2014-Ohio-1307, ¶ 10 (time period for filing post-conviction petition not extended by filing pre-trial hearing transcripts months after the filing of the trial transcript); *State v. Johnson*, 11th Dist. No. 99-T-0143 (Feb. 9, 2001) (Appellant's supplementation of the record with a suppression hearing transcript "is irrelevant," as "[t]he plain language of the statute provides that a petitioner must file a postconviction relief petition within six months from the time the trial transcript, not the suppression hearing transcript, in his direct appeal is filed"). (Emphasis sic.)

{¶ 19} This court has similarly rejected the argument that the filing of a supplemental transcript extends the time period for filing a petition for post-conviction relief. *State v. Chavis-Tucker*, 10th Dist. No. 05AP-974, 2006-Ohio-3105, ¶ 7-8 (rejecting appellant's claim that statute's time limitation was extended by filing two supplemental transcripts months after the filing of his trial transcript). Rather, "[t]he controlling date is when the transcript from appellant's trial was filed." *Id*. at ¶ 8.

{¶ 20} Accordingly, appellant's contention that his petition in case No. 12CR-5963 was extended by the filing of supplemental transcripts is not persuasive. Further, as noted by the state, appellant's post-conviction petition was not predicated on the trial court's rulings made at the suppression hearing; rather, he alleged his counsel was ineffective for "failure to subpoena alibi witnesses, other defense witnesses, and exculpatory evidence." (Mot. for Post-Conviction Relief at 9.) We therefore agree with the state that the petition in case No. 12CR-5963 was untimely under R.C. 2953.21(A)(2).

{¶ 21} With respect to case No. 13CR-4174, while the trial court filed its entry of judgment on October 31, 2014, appellant did not file a timely appeal from the judgment of conviction; rather, on June 17, 2015, appellant filed a motion for delayed appeal. In its decision denying post-conviction relief, the trial court noted that a motion for delayed appeal does not toll the time for filing a post-conviction petition. We agree. *See, e.g., State v. Stanishia*, 10th Dist. No. 03AP-476, 2003-Ohio-6836, ¶ 13 (observing that "appellate courts, including this court, have held that a delayed appeal 'does not toll the time for filing a motion for postconviction relief under R.C. 2953.21(A)(2)'"). *Id*., quoting *State v. Fields*, 136 Ohio App.3d 393, 396 (8th Dist. 1999). Thus, the trial court noted appellant's petition in case No. 13CR-4174 "should have been filed no later than three hundred sixty-five days

after the expiration of his time for filing his appeal, which is December 1, 2015."
(Oct. 31, 2016 Decision & Entry at 4.) Because the petition was not filed until
February 3, 2016, the trial court found it untimely. On review, we find no error with
the trial court's determination that the petition in case No. 13CR-4174 was
untimely.

{¶ 22} The trial court next addressed whether any of the exceptions under R.C.
2953.23(A)(1) were applicable to permit the filing of an untimely petition. The trial
court noted appellant "has made no argument that these exceptions apply," and the
court found the documents attached to support his petition were all available to him
at the time of trial. (Oct. 31, 2016 Decision & Entry at 4.) The trial court also found
appellant failed to show his claim was based on a new federal or state right
recognized by the United States Supreme Court that could be applied retroactively
to his case. Finally, the trial court concluded appellant failed to show by clear and
convincing evidence that, but for the constitutional error, no reasonable fact finder
would have found him guilty of the offenses.

{¶ 23} Based on this court's review, we find no abuse of discretion by the trial court
in its determination the petition was untimely and that appellant failed to establish
the applicability of a statutory exception that would permit the court to consider an
untimely petition. Accordingly, the trial court lacked jurisdiction to consider the
petition for postconviction relief and properly dismissed it. Further, where a trial
court lacks jurisdiction to entertain an untimely petition, the court does not err in
dismissing such petition without conducting an evidentiary hearing. *Sowards* at ¶
28. *See also State v. Reed*, 10th Dist. No. 13AP-450, 2013-Ohio-5145, ¶ 11
("Because appellant has failed to establish the applicability of any exceptions
allowing for filing an untimely, successive petition for postconviction relief, the
trial court properly denied the same without a hearing as it lacked jurisdiction to
review it.").

*State v. Neil,* 2019 WL 2602564, at *3-4. Petitioner thereby has procedurally defaulted claims

fifteen and nineteen for review in these proceedings. *See Foster v. Warden, Chillicothe Corr.*

*Inst.*, 575 F. App'x 650, 652-53 (6th Cir. 2014) (recognizing a procedural default for an untimely

post-conviction petition).

### c. Claim Eighteen

In claim eighteen, Petitioner asserts that he was denied a fair trial due to prosecutorial

misconduct, based on the admission of false testimony by police regarding cell phone evidence

placing Petitioner in proximity to the crimes charged and indicating that police apprehended

Petitioner wearing the same clothing as that worn by the perpetrator in other robberies charged. (*See Traverse*, ECF No. 29, PAGEID # 3290.) Petitioner failed to raise this claim on direct appeal.[1] Again, Petitioner may now no longer present his claim of prosecutorial misconduct to the state courts by operation of Ohio's doctrine of res judicata. "It is well-settled that '[c]laims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of res judicata.'" *Teitelbaum v. Turner*, No. 2:17-cv-583, 2018 WL 2046456, at *15 (S.D. Ohio May 2, 2018) (citing *Hill v. Mitchell*, No. 1:98-cv-452, 2006 WL 2807017, at *43 (S.D. Ohio Sept. 27, 2006) (citing *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967)). Petitioner violated the res judicata rule set forth in *Perry* when he failed to raise the issue on direct appeal. Consequently, the first prong of the *Maupin* test is satisfied. Moreover, Ohio courts have consistently relied upon the doctrine of res judicata to refuse to review the merits of procedurally-barred claims. *See, e.g., State v. Cole*, 2 Ohio St.3d 112 (1982). The state courts were not given the opportunity to enforce this procedural rule due to the nature of Petitioner's procedural default. Further, the Sixth Circuit has held that Ohio's doctrine of res judicata is an independent and adequate ground for denying federal habeas relief. *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Turning to *Maupin*'s independence prong, under the circumstances presented here, Ohio's doctrine of res judicata does not rely on or otherwise implicate federal law. Accordingly, the undersigned finds that the first three *Maupin* factors are satisfied.

Thus, Petitioner has procedurally defaulted claims two, eighteen, fifteen and nineteen.

---

[1] Petitioner presented a claim of prosecutorial misconduct in a successive petition for post conviction relief, but the appellate court affirmed the trial court's dismissal of that action as untimely. *State v. Neil*, 133 N.E.3d at 585.

### d. Cause

The Petitioner may still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violation that he alleges.   "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] '. . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).   It is Petitioner's burden to show cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)).   A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir.), *cert. denied*, 543 U.S. 989 (2004).   Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), *cert. denied sub nom. Hartman v. Bobby*, 554 U.S. 924 (2008).

As cause for his procedural default of claims fifteen and nineteen, in which he asserts the denial of the effective assistance of trial counsel, Petitioner states that he notarized his post conviction petition on Wednesday, January 27, 2016, and submitted it with prison officials for mailing on January 28, 2016, but they did not mail it until Friday, January 29, 2016.  (*Traverse*, ECF No. 29, PAGEID # 3378; *Petitioner's Reply to State's Answer and Motion to Dismiss Defendant's Post-Conviction Petition*, ECF No. 21-1, PAGEID # 1186.)  Petitioner also states that he did not know that his attorney had failed to file a timely appeal in Case Number 13CR-

4174, and Petitioner's failure to file a timely appeal in that criminal case "was entirely due to neglect on the part of his appointed counsel." (PAGEID # 3380.)

These arguments do not assist him. The state appellate court dismissed Petitioner's post conviction petition in Case Number 12CR5963 as one day late. That case, however, involved the November 15, 2012 robbery of the Columbus BMV, to which Petitioner admitted his guilt, and the November 8, 2012, Wendy's robbery. Petitioner's claim of ineffective assistance of counsel does not relate to those charges, but to the charges in Case Number 13CR4174, involving 26 counts of robbery and one count of kidnapping arising from 13 separate crimes committed in 2011. (*See Decision*, ECF No. 21, PAGEID # 751-52; *Motion for Post-Conviction Relief*, ECF No. 21-1, PAGEID # 1105.)[2] The appellate court denied Petitioner's post-conviction petition in Case Number 13CR4174, which forms the basis for his claim of ineffective assistance of trial counsel, as approximately two months late. *State v. Neil,* 2019 WL 2602564, at *3-4. Thus, *Foster*, 575 F. App'x at 650, referred to by the Petitioner, and any purported delay by prison officials in mailing Petitioner's post conviction petition in Case Number 12CR5963, filed one day late, does not establish cause for his procedural default. Likewise, the failure of Petitioner's attorney on direct appeal to file a timely notice of appeal does not establish cause for Petitioner's untimely filing in post conviction proceedings.[3] Petitioner has failed to establish cause for his procedural default of claims fifteen and nineteen.

In claim three, and as cause for his procedural default of claim two, in which Petitioner asserts that he was denied a fair trial due to admission of improper police opinion and victim

---

[2] As discussed, Petitioner filed his post conviction petition in the wrong case number (*i.e.*, Case Number 12CR5963), but the trial court nonetheless deemed it to be filed in both criminal cases. (*Decision and Entry*, ECF No. 21-1, PAGEID # 1196.)

[3] The appellate court granted the motion for a delayed appeal and consolidated the cases for appeal. (*Journal Entry*, ECF No. 21, PAGEID # 458.)

impact evidence, Petitioner asserts ineffective assistance of trial counsel. Such a claim may establish cause for a procedural default, *see Smith v. State of Ohio Dept. of Rehabilitation and Corrections*, 463 F.3d 426, 432 (6th Cir. 2006) (citation omitted), so long as it has been presented to the state courts, and is not, itself, procedurally defaulted. *See Monroe v. Houk*, No. 2:07-cv-258, 2009 WL 2898520, at *25 (S.D. Ohio Sept. 8, 2009) (citing *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000)).[4] The Court will consider the merits of this claim in order to determine whether Petitioner has established cause for his procedural default of claim two.

### e. Ineffective Assistance of Counsel

The appellate court rejected Petitioner's claim of ineffective assistance of trial counsel as follows:

> {¶ 89} In his fourth assignment of error, appellant argues that his trial counsel provided ineffective assistance by failing. . . to object to opinion testimony and victim impact testimony at trial. As explained above, we apply a two-part standard to claims of ineffective assistance, examining (1) whether counsel's performance was deficient, and (2) whether that deficient performance resulted in prejudice to the defendant. *See Strickland* at 687; *Bradley* at 141–42. A party seeking to show prejudice as a result of counsel's alleged deficient performance at trial must establish that there is a reasonable probability that, but for the unprofessional errors of counsel, the outcome of the trial would have been different. *State v. Phillips*, 10th Dist. No. 14AP–79, 2014–Ohio–5162, ¶ 81. "A reasonable probability is one sufficient to undermine confidence in the outcome." *Id*., citing *Strickland* at 694.
>
> ***
>
> {¶ 91} With respect to counsel's failure to object to opinion testimony and victim impact testimony, we note that decisions on trial strategy and tactics are generally granted a wide latitude of professional judgment and it is not our duty to analyze trial counsel's legal tactics and maneuvers. *Id*. at ¶ 86. However, assuming without deciding that appellant's counsel performed deficiently by failing to object to this testimony, we cannot conclude that there is a reasonable probability that the result of the trial would have been different. As discussed more fully below, there was a substantial amount of evidence presented with respect to each of the charges against appellant. Additionally, while the victim impact testimony created a risk of

---

[4] To the extent that Petitioner asserts the denial of the effective assistance of counsel as cause for his procedural default of other allegations of prosecutorial misconduct, Petitioner did not present this same claim to the state courts, and it therefore cannot constitute cause for his procedural default. *Edwards*, 529 U.S. at 452-53.

invoking the jurors' sympathies, the testimony constituted a small part of the overall presentation in support of the state's case and must be considered in that broader context. Appellant has failed to demonstrate a reasonable probability that the outcome of the trial would have been different absent the opinion testimony and victim impact testimony.

{¶ 92} Accordingly, we overrule appellant's fourth assignment of error.

*State v. Neil*, 2016 WL 43574549, at *27-28.

The Court considers this claim *de novo* when determining whether a petitioner can establish cause for a procedural default. *See Hively v. Warden*, 2018 WL 722864, at *7 (S.D. Ohio Feb. 5, 2018) (citing *Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009) ("An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter must meet the higher AEDPA standard of review, while the former need not.") For ease of discussion, the Court will also now address Petitioner's allegation in claim three that his attorney performed in a constitutionally ineffective manner by failing to make a proper record of the hearing on the joinder of charges.

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub. nom. Hale v. Hoffner*, 571 U.S. 1074 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that

counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. A'ppx 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted)); (citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

Here, the appellate court determined that the trial court did not violate Ohio law in permitting admission of police testimony expressing the belief that all of the robberies charged had been committed by a single individual. This Court is bound by that determination. *See Boddie v. Warden, Chillicothe Corr. Inst*., No. 2:13-cv-1243, 2015 WL 792361, at *8 (S.D. Ohio Feb. 25, 2015) (citing *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). The state appellate court further found that police did not provide any improper opinion testimony regarding Petitioner's guilt. That finding is presumed to be correct. 28 U.S.C. § 2254(e).

Petitioner argues that the state appellate court unreasonably determined that police did not offer opinion testimony regarding his guilt of the crimes charged. He refers, at length, to statements contained in his videotaped interview with police in support of his claims of prosecutorial misconduct and improper admission of opinion testimony. (*See Traverse*, ECF No. 29, PAGEID # 3306, 3338-40; *Motions for Leave to Supplement the Record and Traverse*, ECF Nos. 30, 31.) Petitioner also refers to police testimony regarding cell phone towers (PAGEID # 3343-44) in support of his argument that the state appellate court contravened or unreasonably

applied federal law in denying his claim of ineffective assistance of counsel. However,
Petitioner did not present these same arguments or allegations of ineffective assistance of trial
counsel on direct appeal (*See Brief of Defendant-Appellant*, ECF No. 21, PAGEID # 550-51) or
in Rule 26(B) proceedings. (*See Memorandum Decision*, ECF No. 21-1.) A claim must be
presented to the state courts under the same theory in which it is later presented in federal court,
or it is waived. *See Brinkley v. Houk*, 866 F.Supp.2d 747, 778 (N.D. Ohio Dec. 5, 2011) (citing
*Lott v. Coyle*, 261 F.3d 594, 607, 611, 617, 619 (6th Cir. 2001), *cert denied*, 534 U.S. 1147
(2002); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)); *Harris v. Warden, Chillicothe Corr.
Inst.*, 832 F. Supp. 2d 873, 884 (S.D. Ohio Dec. 6, 2011) (citing *Wong*, 142 F.3d at 322)).
Petitioner has failed to rebut the presumption of correctness afforded to the appellate court's
determination of facts. Moreover, and for the reasons discussed by the state appellate court, this
Court likewise concludes that Petitioner cannot establish prejudice, as that term is defined under
*Strickland*, from the admission of victim impact evidence.

Petitioner has failed to establish cause for his procedural defaults.

### f. Actual Innocence

Finally, the Petitioner has failed to establish that his claims may avoid the procedural bar
under the actual innocence exception.

The United States Supreme Court has held that a claim of actual innocence may be raised
"to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional
claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a
constitutional violation has probably resulted in the conviction of one who is actually innocent, a
federal habeas court may grant the writ even in the absence of a showing of cause for the
procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible

showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition.  *Schlup*, 513 U.S. at 317.  The actual innocence claim in *Schlup* is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id*. at 315 (quoting *Herrera v. Collins,* 506 U. S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt.  *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005).  The Sixth Circuit has offered the following explanation of the actual innocence exception:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ +] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted).

Because Petitioner fails to satisfy these standards, the actual innocence exception does not operate to save his otherwise procedurally defaulted claims.

Petitioner has waived claims two, eighteen, fifteen and nineteen.

## IV. Merits - Standard of Review

The standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA")

govern this case. The United States Supreme Court has described the AEDPA as "a formidable

barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court"

and emphasized that courts must not "lightly conclude that a State's criminal justice system has

experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v.*

*Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ); *see*

*also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential

standard for evaluating state-court rulings, and demands that state court decisions be given the

benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids

a federal court from granting habeas relief with respect to a "claim that was adjudicated on the

merits in State court proceedings" unless the state-court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be

correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person
> in custody pursuant to the judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be correct. The applicant shall

37

have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley,* 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub nom. Coley v. Robinson*, 571 U.S. 992 (2013). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,] or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389. 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id*. at 748-49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.  Claim One

In claim one, Petitioner asserts that he was denied a fair trial due to improper joinder of charges causing undue prejudice, particularly in view of the lack of evidence of his involvement in multiple robbery and kidnapping charges and an insufficient *modis operandi* connecting all of these charges. (*Petition*, ECF No. 6, PAGEID # 34-35.)

The state appellate court rejected this claim, reasoning as follows:

Appellant asserts that the trial court erred by joining the two indictments for trial. Appellant asserts that joinder of the indictments was prejudicial to appellant and that the state was unable to rebut the prejudice by showing that evidence of the offenses under one indictment would have been admissible at a separate trial on the other indictment. Although appellant was not present to object to joinder, he did file a motion to sever the indictments.

{¶ 60} Pursuant to Crim.R. 13, a trial court may order two or more indictments to be tried together "if the offenses or the defendants could have been joined in a single indictment or information." Crim.R. 8(A) provides that two or more offenses may be charged in the same indictment if they "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981), fn. 2.

{¶ 61} If similar offenses are properly joined, a defendant may move to sever the charges pursuant to Crim.R. 14(A): "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." To demonstrate that a trial court erred by denying a motion to sever, a defendant "must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *Torres* at syllabus.

{¶ 62} We note that appellant's motion to sever provided, at best, minimal support for his claim of prejudice. The memorandum in support of that motion is scarcely more than one page long, and with respect to the issue of prejudice, simply asserts that appellant would be prejudiced by joining the 2011 offenses together with the November 2012 offenses. This unsupported assertion may well fall short of establishing that his rights were prejudiced or providing the "trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to fair trial." *Schaim* at 59. *See also State v. Massey*, 10th Dist. No. 99AP–1355 (Nov. 28, 2000) ("Defendant has not pointed to any evidence of actual prejudice, and may not prevail by presuming prejudice based on the number of counts. Defendant has failed to suggest how he likely would have been acquitted on some counts had the four incidents been tried separately, and thus has not satisfied the first prong of *Torres*."). Appellant's counsel indicated to the trial court immediately before trial that the brief motion was effectively intended to

preserve the issue for appellate review. Despite the minimal support contained in the motion to sever, however, we will consider the question of whether the state could rebut any showing of prejudice.

{¶ 63} Even if a defendant establishes that the joinder was prejudicial, the state may rebut the showing of prejudice in two ways. *State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 50. First, the state may demonstrate that evidence of the joined offenses would be admissible as "other acts" evidence under Evid.R. 404(B) in separate trials. *Id.* Second, the state may demonstrate that evidence of the joined offenses is simple and direct. *Id.* These tests are disjunctive; satisfying one test negates a defendant's claim of prejudice without having to consider the other test. *State v. Wilson*, 10th Dist. No. 10AP–251, 2011–Ohio–430, ¶ 15.

{¶ 64} Evid.R. 404(B) provides, in relevant part, that evidence of other crimes or acts is not admissible to prove the character of a person in order to show action in conformity with such character. Such evidence may, however, be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In this case, the state argues that the evidence related to the charges in each indictment would have been admissible at separate trials under Evid.R. 404(B) to prove identity by establishing a modus operandi. "To be admissible to prove identity through a certain modus operandi, other acts evidence must be related to and share common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527 (1994), paragraph one of the syllabus.

{¶ 65} The Supreme Court of Ohio and this court have held that evidence of multiple robberies may be admissible as other acts evidence where there are sufficient common features to establish a modus operandi. In *State v. Jamison*, 49 Ohio St.3d 182 (1990), the Supreme Court found that evidence of seven other robberies was admissible in a trial for aggravated murder and aggravated robbery to prove identity. The court concluded that the evidence regarding the seven other robberies established a pattern: each of the robberies occurred during a six-month period; each establishment robbed was located in the downtown area of Cincinnati; all but one of the robberies occurred on weekday afternoons; all of the establishments were first-floor, walk-in businesses; the defendant physically took or attempted to take money from the register except for the one business that had no register; and the defendant forced, threw, or knocked victims to the floor and consistently directed violence toward his victims' heads. *Id.* at 186. Because the characteristics of this pattern were consistent with the incident giving rise to the aggravated murder and aggravated robbery charges, evidence related to the other robberies was admissible to prove that the defendant committed the aggravated murder and aggravated robbery. *Id.* ("These other acts, *i.e.*, robberies, do not simply prove appellant's character; more importantly, they are probative to ascertain appellant's identity as the Central Bar killer.").

{¶ 66} This court has similarly ruled that joinder of multiple robbery charges is not improper where evidence of the robberies would be admissible in separate trials under Evid.R. 404(B). *Wilson* at ¶ 21; *State v. Sealy*, 10th Dist. No. 09AP–1128, 2010–Ohio–6294, ¶ 19. In *Wilson*, the court described the similarity of the relevant crimes:

> The crimes here all occurred during business hours and all involved restaurants in the south-side area of Columbus so as to be geographically linked. All four robberies involved a black man with missing teeth that approached the register and demanded money from it. In three of the four robberies the evidence established the perpetrator placed a food order prior to demanding money, and in fact, the same item, i.e., pepper steak, was ordered in each of the robberies at Hunan King. Also, in three of the four robberies, the evidence established the perpetrator showed a gun while making his demands. Both the Pizza Hut and the KFC robberies involved the use of a note and the presence of a plastic bag, and both Hunan King robberies involved the person counting to ten while waiting for the money. Moreover, appellant was identified by witnesses from three of the four robberies.

*Id*. at ¶ 20. The court noted that although the crimes differed from one another in some respects, "admissibility under Evid.R. 404(B) is not adversely affected simply because the other [crimes] differed in some details." (Internal citations omitted.) *Id*. at ¶ 21. Similarly, in *Sealy*, the court found that the state had rebutted the defendant's claims of prejudicial joinder:

> Here, the record contains evidence of five aggravated robberies and related offenses that occurred over a five-month period. The crimes are geographically linked as they all occurred within less than a two-mile radius of appellant's residence. In each crime, appellant was described as wearing dark clothing, entering a business brandishing a handgun, and demanding money from the cash register. In three of the robberies, appellant was described as firing the gun. Appellant's car was placed at three of the robberies, and he was positively identified by witnesses from four of the robberies. Clearly, the evidence here establishes the robberies followed a similar pattern and were geographically linked such that evidence of one could have been introduced by the state in a trial of each of the others under Evid.R. 404(B) to establish appellant's identity through his modus operandi. Thus, appellant was not prejudiced by the joinder of the offenses for trial.

*Sealy* at ¶ 19.

{¶ 67} In this case, the 2011 robberies shared many similar characteristics: the suspect was an African–American male, wearing dark clothing, including a mask, and dark gloves with white markings or letters on the gloves. The suspect brandished a small handgun, which he held in his left hand. The suspect had employees open cash registers and reached into the cash registers with his right hand to take the contents. In all but the first robbery, the suspect either jumped over or walked behind the counter, thereby entering an area where the public would not normally be present. In all but one of the robberies, the suspect ordered the employees to get on the ground. Ten of the 13 robberies in 2011 occurred at night. Eight of the 13 robberies occurred at restaurants, mostly Subway or Tim Horton establishments, and another 3 robberies occurred at gas stations. Nine of the robberies occurred in the northern part of Franklin County.

{¶ 68} Many of the distinguishing characteristics from the 2011 robberies were also present in the 2012 robberies that were charged in case No. 12CR–5963. In the November 8, 2012 Wendy's robbery, the suspect was an African–American male who wore dark clothing, including a mask, and dark gloves with white markings or letters. The robbery occurred at night, and the suspect, who held a small handgun in his left hand, went behind the counter and reached into the cash register after ordering the employees to open it. He also ordered the employees to get on the floor. The robbery occurred in the northern part of Franklin County. Similarly, in the November 15, 2012 BMV office robbery, appellant, an African–American male, wore dark clothing, including a mask, and dark gloves with white markings or letters. He brandished a small handgun in his left hand. The robbery occurred just after 6:30 p.m., as the BMV office was closing for the day. In committing the robbery, appellant went behind the counter into an area where the public would not normally be present. The BMV office was located in the northern part of Franklin County. Under these circumstances, we find that the 2012 robberies followed a similar pattern and shared numerous characteristics with the series of robberies committed in 2011. Therefore, the evidence of the 2011 robberies could have been introduced by the state in a trial of the 2012 robberies under Evid.R. 404(B), and vice versa. Appellant was not prejudiced by the joinder of these offenses for trial.

{¶ 69} Accordingly, we overrule appellant's second assignment of error.

*State v. Neil*, 2016 WL 3574549, at *18-21 (footnote omitted).

To the extent that Petitioner raises a claim regarding the alleged violation of state evidentiary rules, this claim does not provide him a basis for relief. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 18 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state

law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id*. (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Further, alleged errors in state evidentiary rulings are not cognizable on federal habeas corpus review unless the State's ruling is so fundamentally unfair that it violates due process. *See Moreland v. Bradshaw*, 699 F.3d 908, 922 (6th Cir. 2012) (citing *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011) (internal citation omitted)); *see also Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Such are not the circumstances here. To show a due process violation rooted in an evidentiary ruling, the Sixth Circuit typically requires a Supreme Court case establishing a due process right with regard to that specific kind of evidence. *Id*. (citation omitted).

However, "[a]lthough the Supreme Court has suggested in a footnote that inappropriate joinder could be so prejudicial as to violate a defendant's Fifth Amendment right to a fair trial, the Supreme Court has not held improper joinder to be unconstitutional." *Wheeldon v. Campbell*, No. 16-2054, 2017 WL 3165083, at *3 (6th Cir. March 6, 2017) (citing *United States v. Lane,* 474 U.S. 438, 448 & n.8 (1986) ("Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.") The Sixth Circuit has held that the Supreme Court's language in *Lane* is *dicta* and therefore does not constitute clearly established federal law under the provision of 28 U.S.C. § 2254(d) so as to provide a basis for habeas corpus relief. *Tighe v. Berghuis*, 2017 WL 4899833, at *2 (6th Cir.

April 21, 2017) (citing *Mayfield v. Morrow*, 528 F. App'x 538, 541-42 (6th Cir. 2013).

Moreover, "a jury is 'presumed capable of considering each count separately,'" and a petitioner

must provide "specific evidence of prejudice caused by the improper joinder." *Wheeldon v.

Campbell,* 2017 WL 3165083, at *3 (citing *United States v. Cope*, 312 F.3d 757, 781 (6th Cir.

2002); *United States v. Saadey*, 393 F.3d 669, 679 (6th Cir. 2005)). Thus, relief may only be

available where a defendant can demonstrate actual, rather than potential prejudice. *Tighe v.

Berghuis*, 2017 WL 4899833, at *2 (citing *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007).

The joinder of offenses in a single trial must actually render the petitioner's trial "fundamentally

unfair and hence, violative of due process." *Rodriguez v. Jones*, 625 F.Supp.2d 552, 561 (E.D.

Mich. 2009) (quoting *Robinson v. Wyrick*, 735 F.2d 1091, 1094 (8th Cir. 1984) (internal citation

omitted)). Petitioner cannot meet this burden here. The appellate court determined that the

evidence involving separate robberies would have been admissible in separate trials to establish

Petitioner's identity under Ohio Rule of Evidence 404(B). Thus, the joinder of separate charges

into a single trial efficiently utilized state resources and did not deprive Petitioner of a

constitutionally fair trial. *See Kwasny v. Stewart*, No. 2:15-cv-13475, 2017 WL 1279230, at *5

(E.D. Mich. April 6, 2017) (citations omitted).

Claim one is without merit.

## V.  Claim Three

In claim three, Petitioner asserts that he was denied the effective assistance of trial

counsel, because his attorney failed to make a record of the hearing on the joinder of charges.

The state appellate court rejected this claim in relevant part as follows:

> [A]ppellant argues that his trial counsel provided ineffective assistance by failing
> to have a record made of the joinder hearing[.]

> ***

44

> [W]e have concluded that joinder of the indictments was proper in this case. Accordingly, even if appellant's counsel performed deficiently by failing to have a record made of the joinder hearing, appellant cannot demonstrate that he was prejudiced by such deficiency.

*State v. Neil*, 2016 WL 3574549, at *27-28.

Petitioner argues that he has established prejudice, because he would have informed the trial court that prosecutors falsely claimed that Petitioner had been apprehended wearing the same clothing as that of the perpetrator in other crimes charged. (*Traverse*, ECF No. 29, PAGEID # 3358.) However, the record indicates that defense counsel was present during the joinder hearing. Nothing prevented counsel from making that argument at that time, as he did at the hearing on the motion to suppress evidence. (*Transcript*, ECF No. 21-5, PAGEID # 1873.) Immediately prior to the start of trial, defense counsel submitted a memorandum in opposition to the motion for a joinder. (*Transcript*, ECF No. 21-5, PAGEID # 1874.) The trial judge gave the parties an opportunity to address the issue at that time. (PAGEID # 1874-77.) As discussed, the joinder of offenses did not violate state or federal law.

"Surmounting *Strickland's* high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at 123, 129 S.Ct. at 1420. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* The Court is not persuaded that Petitioner can establish prejudice under *Strickland* based on his attorney's failure to make a record of the hearing on this issue.

Claim three is without merit.

## VI. Claim Four

In claim four, Petitioner asserts that he was denied a fair trial based on improper jury instructions. The state appellate court rejected this claim as follows:

> [A]ppellant asserts the trial court erred by instructing the jurors that they could consider other acts evidence on the issue of identity. Appellant argues that this instruction was not properly tailored to the facts of the case and allowed the jury to use evidence of the November 15, 2012 BMV office robbery, where appellant was apprehended, to prove that he committed all the other robberies. The state responds that the instruction at issue properly served to limit the jury's use of the other acts evidence and ensure that such evidence was not used as propensity evidence.

> {¶ 84} A trial court has broad discretion in instructing the jury. *State v. Daniels*, 10th Dist. No. 13AP–969, 2014–Ohio–3697, ¶ 17. Accordingly, we review the trial court's instructions for abuse of discretion. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

> {¶ 85} The Ohio Jury Instructions provides the following instruction related to other acts evidence:

> 1. * * * Evidence was received about the commission of (crime[s]) (wrong[s]) (act[s] ) other than the offense(s) with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in (conformity) (accordance) with that character. If you find that the evidence of other (crime[s]) (wrong[s]) (act[s]) is true and that the defendant committed (it) (them), you may consider that evidence only for the purpose of deciding whether it proves

> (Use appropriate alternative[s])

> (a) the absence of (mistake) (accident),

> (or)

> (b) the defendant's (motive) (opportunity) (intent or purpose) (preparation) (plan) to commit the offense charged in this trial,

> (or)

> (c) knowledge of circumstances surrounding the offense charged in this trial,

(or)

(d) the identity of the person who committed the offense in this trial,

(or)

(e) (describe other purposes).

 That evidence cannot be considered for any other purpose.

(Emphasis sic.) Ohio Jury Instructions, CR Section 401.25.

{¶ 86} In this case, the trial court gave the jury the following instruction:

Now, members of the jury, evidence was admitted of other acts which may have been committed by the defendant. You are to consider this evidence only on the issue of identity. If you believe that the defendant committed the other act, you may consider evidence of scheme, plan or system as you decide whether the acts alleged in the indictment, if committed, were committed by the defendant rather than some other person.

Now, members of the jury, let me caution you that the evidence of the scheme, plan or system is only one of the things you are to consider in determining identity. The State of Ohio must prove identity beyond a reasonable doubt. If you find that the defendant committed the other act, you may not presume that he committed the acts charged. You may, however, consider the other act, along with all the other evidence, in deciding whether the State of Ohio has proved beyond a reasonable doubt that the defendant, rather than some other person, committed the offense charged.

(Oct. 1, 2014 Tr. at 1091–92.)

{¶ 87} As explained above, we conclude that, under the circumstances in this case, the other acts evidence presented in this case shared sufficient common characteristics to be admissible to prove identity through a particular modus operandi. *See Lowe* at paragraph one of the syllabus. The trial court's instruction in this case, which was consistent with the model instruction provided in the Ohio Jury Instructions, constituted a proper explanation of the permissible and impermissible uses of the other acts evidence. Therefore, we cannot conclude that the trial court abused its discretion by giving this instruction. *See State v. Hillman*, 10th Dist. No. 14AP–252, 2014–Ohio–5760, ¶ 37.

{¶ 88} Accordingly, we overrule appellant's third assignment of error.

*State v. Neil*, 2016 WL 3574549, at *26-27.

The record does not indicate that the trial court's jury instructions on other bad acts evidence warrants relief. Alleged errors in state jury instructions may provide for federal habeas relief "only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741-42 (6th Cir. 2007), *cert. denied*, 552 U.S. 1261 (2008) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

> The question in [ ] a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' *Cupp v. Naughten,* 414 U.S. [141,] 147 [ (1973) ], not merely whether 'the instruction is undesirable, erroneous, or even universally condemned,' *id*. at 146, 94 S.Ct. 396." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

*Id*. The record here fails to reflect that this is such an extraordinary case. Moreover,

> [b]oth the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69–70; *Dowling v. United States*, 493 U.S. 342, 353–54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439–40 (6th Cir. 2001); *Pennington v. Lazaroff,* 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893–95 (6th Cir. 1974).

*Norris v. Davis*, No. 05–60126, 2006 WL 1581410 (E.D. Mich. May 3, 2006); *see also Williams v. Warden, Chillicothe Corr. Inst.*, No. 2:13-cv-1002, 2015 WL 3466120, at *11 (S.D. Ohio June 1, 2015) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.") (quoting *Bugh v. Mitchell*, 329 F.3d 469, 512-13 (6th Cir. 2003)).

Claim four is without merit.

## VI.  Claims Five and Six

In claims five and six**,** Petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions and that his convictions are against the manifest weight of the evidence. This latter claim does not provide a basis for federal habeas corpus relief.

Unlike a claim that the evidence at trial was not sufficient to support a conviction – a claim that implicates the due process clause of the United States Constitution – a claim that the conviction was against the manifest weight of the evidence raises only a matter of state law. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983). Consequently, the Court cannot grant federal habeas corpus relief on this claim. *See Pulley v. Harris*, 465 U.S. at 41.

The state court rejected Petitioner's claim of insufficiency of the evidence as follows:

{¶ 94} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP–1093, 2010–Ohio–1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id*.

{¶ 95} Appellant was convicted of 2 counts of robbery with respect to each of the 15 incidents described above. The indictments charged that in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, appellant recklessly inflicted, attempted to inflict, or threatened to inflict physical harm on another, thereby violating R.C. 2911.02(A)(2). The indictments also charged that in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, appellant recklessly used or threatened the immediate use of force against another, thereby violating R.C. 2911.02(A)(3). Appellant was also convicted on one count of kidnapping with respect to the October 10, 2011 Marathon robbery, four counts of kidnapping with respect to the November 8, 2012 Wendy's robbery, and one count of kidnapping with respect to the November 15, 2012 BMV office robbery. With regard to those charges, the indictments asserted that by force, threat, or deception, appellant restrained another of his or her liberty with the purpose to facilitate the commission of the robbery or flight thereafter, thereby violating R.C. 2905.01(A)(2). In the count arising from the October 10, 2011 Marathon robbery, appellant was charged with kidnapping one or both of the employees who were present during the robbery. For the November 8, 2012 Wendy's robbery, appellant was charged with kidnapping four of the employees who were present during the robbery. Similarly, for the November 15, 2012 BMV office robbery, appellant was charged with kidnapping the office manager who was present during the robbery.

1. Sufficiency of evidence related to the November 15, 2012 BMV office robbery

{¶ 96} Appellant does not appear to contest his convictions on the two robbery charges and one kidnapping charge arising from the November 15, 2012 robbery; his brief on appeal only refers to convictions based on the other 14 incidents. Nonetheless, we will briefly review the evidence supporting those convictions. Appellant admitted to committing the November 15, 2012 BMV office robbery in the interrogation video and his counsel acknowledged at trial that appellant committed that robbery. The state presented testimony and evidence demonstrating that appellant entered the BMV office carrying a handgun, pointed that handgun at one or more of the employees, demanded money, and took money from the employees. By taking the money, appellant committed a theft offense. *See, e.g., State v. Green*, 10th Dist. No. 03AP–813, 2004–Ohio–3697, ¶ 11 (explaining that a "theft offense" includes knowingly obtaining or exerting control over property or services without consent of the owner, with purpose to deprive the owner of the property or services).

{¶ 97} The Supreme Court of Ohio has held that "[o]ne cannot display, brandish, indicate possession of, or use a deadly weapon in the context of committing a theft offense without conveying an implied threat to inflict physical harm." *State v. Evans*, 122 Ohio St.3d 381, 2009–Ohio–2974, ¶ 23. "It is the very act of displaying, brandishing, indicating possession, or using the weapon that constitutes the threat to inflict harm because it intimidates the victim into complying with the command to relinquish property without consent." *Id*. Thus, there was sufficient evidence to establish that all of the elements of robbery, as defined under R.C. 2911.02(A)(2), were established. Similarly, we conclude that appellant's actions of pointing the gun at the BMV office employees constituted a threat of the immediate use of force against them in the commission of the theft offense, thereby establishing the elements of robbery as defined under R.C. 2911.02(A)(3). *See, e.g., State v. Taylor*, 10th Dist. No. 14AP–254, 2015–Ohio–2490, ¶ 17 (testimony that defendant pointed a gun at victims during robbery, made one victim lie on the ground at gunpoint, and threatened that accomplice would shoot victims if they got up off the ground was sufficient to support robbery conviction based on use or threat of immediate use of force).

{¶ 98} With respect to the kidnapping charge arising from the November 15, 2012 BMV office robbery, one of the employees present during the robbery testified that when the office manager started to come out of the back room and move toward the front area, appellant pointed his gun at the office manager and told her to go sit down. As the video of the robbery was played for the jury, the employee identified the office manager and demonstrated when appellant told her to go sit down. Thus, there was evidence that to facilitate the commission of the robbery, appellant restrained the liberty of the office manager by ordering her, at gunpoint, to sit down. *See, e.g., State v. Jackson*, 10th Dist. No. 14AP–748, 2015–Ohio–5114, ¶ 21 (holding that evidence was sufficient to support kidnapping conviction where appellant held victims at gunpoint and prevented them from leaving). Therefore,

the evidence was sufficient to establish the elements of kidnapping, as defined under R.C. 2905.01(A)(2).

## 2. Sufficiency of evidence related to November 8, 2012 Wendy's robbery

{¶ 99} Appellant was convicted on two counts of robbery and four counts of kidnapping as a result of the November 8, 2012 Wendy's robbery. The state presented evidence and testimony establishing that a masked man entered the Wendy's restaurant, pointed a gun at the manager and instructed all the employees to get on the floor. The restaurant manager testified that the robber compelled her to open the cash registers. The robber took the money from the cash registers and fled the restaurant. The restaurant manager identified herself and the three other employees named in the kidnapping counts as being present during the robbery and testified that they were forced to get on the floor or otherwise prevented from moving about freely. Similar to the reasoning set forth above, we conclude that this evidence was sufficient to demonstrate that the individual depicted in the Wendy's surveillance video committed robbery and kidnapping.

{¶ 100} Appellant, however, asserts that there was not sufficient evidence to establish that he was the individual who committed those crimes. As explained above, there were numerous similarities between appellant's actions in robbing the BMV office on November 15, 2012, and the conduct of the robber during the November 8, 2012 Wendy's robbery. Both robberies occurred during the evening. Appellant and the Wendy's robber were African–American men who wore dark clothing and masks while committing the robberies. Appellant and the Wendy's robber both wore dark gloves with white markings or letters. Appellant and the Wendy's robber each held a small handgun in the left hand while committing the robberies and each went behind the counter into areas where the public would not normally be present. The restaurant manager testified that the robber was approximately 5′7″ and weighed about 200 pounds; there was evidence introduced that appellant was 5′9″ and weighed 222 pounds. Additionally, there was evidence from the police license plate reader that appellant's van was in the area near the robbery a few minutes after it occurred. This evidence, viewed in the light most favorable to the prosecution, would be sufficient to establish that appellant committed the robbery and kidnapping on November 8, 2012.

## 3. Sufficiency of the evidence related to the 2011 robberies

{¶ 101} Appellant similarly argues that the evidence was insufficient to establish that he committed the robberies giving rise to the 26 robbery counts and 1 kidnapping count contained in the indictment in case No. 13CR–4174. As set forth above, the state presented evidence and testimony with respect to each incident establishing that an African–American man entered each of the establishments, brandished or pointed a gun at the employees, and demanded money. The robber wore dark clothing and a mask obscuring most of his face. He wore dark gloves with white markings or lettering. He ordered the employees of the various

establishments to get on the ground. He carried a gun in his left hand and used his right hand to reach into the cash registers to take money. Ten of the 13 robberies that occurred in 2011 were committed in the evening or at night. In all but the first of the 2011 robberies, the robber jumped over or went behind the counters into areas where the public would not normally be present. As with the November 8, 2012 Wendy's robbery, these characteristics of the individual who committed the 2011 robberies were similar to appellant's actions during the November 15, 2012 BMV office robbery. Additionally, several of the witnesses' descriptions of the robber's height and weight were consistent with appellant's height and weight. With regard to the kidnapping charge arising from the October 10, 2011 Marathon robbery, one of the employees testified that the robber pushed his fellow employee to the ground, thereby restricting her movement. This act was also visible on the video that was played for the jury. Viewing all of this evidence in the light most favorable to the prosecution, it was sufficient to establish that appellant committed the crimes for which he was convicted in case No. 13CR–4174.

\*\*\*

{¶ 103} In this case, the state set forth extensive evidence and testimony related to each of the robbery incidents. In addition to testimony from at least one employee of each business that was robbed, the state offered into evidence video and or photographic evidence from each of the robberies. The state also presented the video of appellant's interrogation, in which he admitted to committing the November 15, 2012 BMV office robbery. Appellant's explanation of his whereabouts on the evening of November 8, 2012 was inconsistent with the evidence showing that his van was near the area of the Wendy's robbery shortly after the robbery occurred. Appellant stated that he worked out at a fitness center in Worthington and then traveled to a private client's home, which would have required him to travel west, away from the location of the robbery. However, the location where the license plate reader detected his van was east of the fitness center where he claimed to have worked out. Appellant also made comments during his interrogation that could be construed to indicate that he had committed other robberies. As noted above, in several instances the witnesses' descriptions of the robber were consistent with appellant's height and weight.

*State v. Neil*, 2016 WL 3574549, at \*28-31.

A criminal defendant may be convicted consistent with the United States Constitution only if the evidence adduced at trial is sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To determine whether the evidence was constitutionally sufficient to support a conviction, a court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296

(1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required to "'rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume, even if it does not appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Jackson,* at 326).

Further, this Court must afford a "double layer" of deference to state court determinations about the sufficiency of the evidence. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. denied*, 558 U.S. 1114 (2010), deference must be given, first, to the jury's finding of guilt because the standard, established by *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, and even if de novo review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id. See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009), *cert. denied*, 562 U.S. 868 (2010). This is a substantial hurdle for a habeas petitioner to overcome. For the reasons well detailed by the state appellate court, this Court is not persuaded that Petitioner has met this burden here.

"A conviction may be sustained based upon nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 602, 606 (6th Cir. 2008) (citing *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)); *see also Gipson v. Sheldon*, 659 F. App'x 871, 877 (6th Cir. 2016) ("Circumstantial evidence is sufficient to support a conviction as long as the jury is convinced beyond a reasonable doubt.") (citing *Holland v. United States*, 348 U.S. 121, 139–40 (1954); *Tucker v. Palmer*, 541 F.3d 652, 657 (6th Cir. 2008) (and cases cited therein), *cert. denied*, 558

U.S. 845 (2009)).  Moreover, "a federal habeas court reviewing the sufficiency of evidence to support a conviction need not rule out all possible interpretations of the circumstantial evidence." *Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002) (citing *Jamison v. Collins*, 100 F. Supp. 2d 647, 705 (S.D. Ohio 2000)).  Thus, [a] conviction may be based upon circumstantial evidence as well as inferences based upon the evidence."  *Id*. at 647-48 (citing *Gonzalez v. Reiner*, 177 F. Supp. 2d 211, 218 (S.D.N.Y. 2001)) (quoting *United States v. Strauss*, 999 F.2d 692, 696 (2nd Cir. 1993)).

Petitioner argues that the state appellate contravened or unreasonably applied federal law, or based its decision on an unreasonable determination of the facts in light of the evidence presented, because the prosecutor coached one of the witnesses of the BMV robbery to say that Petitioner wore a hood or a hooded sweatshirt and falsely argued that Petitioner wore the same or similar clothing when police arrested him as that worn by perpetrator in the other robberies charged.[5]  (*Traverse*, ECF No. 29, PAGEID # 3361.)  Additionally, Petitioner argues that Jacqueline Daniels described the November 2012 Wendys' robber as a white man and Detective McDonnel testified at the hearing on the motion to suppress that one of the witnesses in one of the robberies charged had described a white male suspect.  (PAGEID # 3363; *see Transcript*, ECF No. 21-4, PAGEID # 1178-79.)  Thomas Musick described the man who robbed the BP gas station as a light-skinned black man.  Paula Bunch testified that the man who robbed the Subway in April 2011 had thin eyebrows and acne bumps under his eyes.  (PAGEID # 3369-70.) Additionally, Petitioner states that he did not order any of the employees of the BMV down on the ground, as the perpetrator of prior robberies had done, but instead told one of the employees

---

[5] Specifically, Petitioner states that he was arrested wearing a hoodless nylon zip-up Pittsburg Steelers jacket, black athletic pants, a knit hat over his head and another over his mouth, and black Air Jordan sneakers. (*Traverse*, ECF No. 29, PAGEID # 3296.)  His gloves had white markings on them, but were not "mechanics" gloves and did not display the word "mechanix."  (PAGEID # 3295.)

to sit in a chair.  (PAGEID # 3365.)  He committed the BMV robbery at 6:30 p.m., as opposed to later in the evening, and three of the robberies charged had been committed during the day.  (PAGEID # 3365-66.)  Petitioner further argues that witnesses gave inconsistent descriptions of the suspect's height and weight that did not correspond to that of the Petitioner.  (PAGEID # 3367-69.)  He argues that jumping or vaulting behind a counter is a commonly used tactic and not sufficiently unique so as to tie the all of the crimes charged to the same perpetrator.  (PAGEID # 3367.)  Petitioner maintains that he did not sufficiently match the descriptions provided by witnesses.

Upon review of the record, this Court is not persuaded that Petitioner has rebutted the presumption of correctness provided to the factual findings of the state appellate court.  28 U.S.C. § 2254(e).  To the contrary, review of the testimony of the alleged victims and witnesses reflects that the perpetrator used a similar pattern or modus operandi to effectuate the crimes charged.  That is, an individual generally described as a dark skinned black man wearing all black clothing with dark gloves and dark shoes carrying a small firearm in his left hand would enter the establishment, demand money, and typically order employees onto the ground.  He wore a mask or covered his face so that he could not be identified.  He typically jumped over or went behind the counter and committed the crimes charged in the evening – or during the change of shift or in the early morning hours, on at least one occasion.  Petitioner's physical characteristics also generally matched the description of the masked gunman.  Further, Petitioner could not explain the presence of his van in the area shortly after the November 8, 2012, Wendy's robbery.  He identified his van from the surveillance video taken at the Tim Horton's robbery.

Under the deferential standard of review, and in view of this evidence discussed by the state appellate court, the similarity of the offenses charged, and the perpetrator's use of a "consistent and unique modus operandi", this Court concludes that the state appellate court's decision rejecting Petitioner's claim of insufficiency of the evidence does not justify federal habeas corpus relief. *See Smith v. Warden*, 2017 WL 4349095, at *28 (S.D. Ohio Sept. 29, 2017) (citing *United States v. Bowers*, 811 F.3d 412, 426 (11th Cir. 2016) (internal citation omitted). Evidence indicating the use of the same modus operandi may constitute sufficient evidence to sustain a conviction. *See Price v. Warren*, No. 12-2238, 2015 WL 3970124, at *7 (D. N.J. June 30, 2015) (citing *United States v. Cobb*, 397 F. App'x. 128, 135–36 (6th Cir. 2010)) (denying insufficiency of the evidence claim for Huntington Bank robbery where the robbery had a similar modus operandi to robbery of Chase Bank and DNA evidence supported the conviction); *Dixon v. Tampkins*, No. 12–2821, 2013 WL 1246751, at *9 (C.D. Cal. Feb. 11, 2013) ("Based on modus-operandi evidence from Petitioner's other convictions, a rational fact finder could have inferred that he committed the four crimes in question.") (citing *United States v. Momeni*, 991 F.2d 493, 494 (9th Cir. 1993); *United States v. Hirokawa*, 342 F. App'x. 242, 248–49 (9th Cir. 2009)); *report and recommendation adopted by*, 2013 WL 1245981 (C.D. Cal. March 27, 2013); *see also United States v. Moore*, 115 F.3d 1348, 1364 (7th Cir. 1997) (circumstantial evidence consisting of use of the same modus operandi, when considered in conjunction with direct evidence, provided sufficient evidence to sustain robbery conviction); *Calkins v. Soto*, No. 13-1761-DOC (DTB), 2014 WL 1224795 (C.D. Cal. March 21, 2014) (use of same modus operandi constituted circumstantial evidence of guilt).

Claims five and six do not provide a basis for relief.

## VII.  Claims Seven, Eight, and Nine

In claims seven, eight and nine, Petitioner asserts that he was denied the effective

assistance of appellate counsel, because his attorney failed to raise on appeal claims of

ineffective assistance of trial counsel and the denial of Petitioner's right to be present at the

joinder hearing.  The state appellate court denied these claims in relevant part as follows:

> Appellant's first proposed assignment of error alleges ineffective assistance of trial counsel in failing to present allegedly exculpatory identification evidence following the cross-examination of a witness.  Appellant cites a portion of the trial where his counsel cross-examined one of the robbery witnesses about whether he saw any distinguishing marks, such as tattoos, on the robber and referred the witness's attention to an image taken from a video of that robbery showing a portion of the robber's leg as he climbed over the counter of the restaurant.  The witness testified that he did not see any tattoo on or near the robber's ankle.  Appellant claims that his trial counsel provided ineffective assistance by failing to follow-up on this testimony by introducing photographs that appellant provided to his counsel purporting to show that appellant has a tattoo on his lower leg area or by having appellant show the tattoo on his leg to the jury.

> Appellant's second proposed assignment of error similarly asserts ineffective assistance of trial counsel in failing to present allegedly exculpatory evidence related to the identification of the robbery suspect.  Specifically, appellant cites to several news articles related to a robbery of a McDonald's restaurant in 2013, and the descriptions of the suspect in those articles.  Appellant suggests that those descriptions are similar to the descriptions offered by witnesses in the 2011 and 2012 robberies for which appellant was convicted.  Appellant argues that this evidence would have been exculpatory and that his trial counsel provided ineffective assistance by failing to introduce it.

> Appellant's first two proposed assignments of error alleged that his appellate counsel was ineffective for failing to assert claims that his trial counsel was ineffective.  This requires us to apply the *Strickland* test for ineffective assistance of counsel to the performance of both his appellate and trial counsel.  Thus, even if appellant were able to establish that his appellate counsel was deficient for failing to raise these issues in his direct appeal, he would also be required to demonstrate a reasonable probability of success if the issues had been raised. . . .

> In this case, we cannot conclude that appellant's appellate counsel performed deficiently by failing to raise appellant's first two proposed assignments of error as part of the direct appeal.  Both the first and second proposed assignments of error assert that appellant's trial counsel was ineffective by failing to introduce certain materials into evidence.  Because these materials were not introduced into evidence,

they were not part of the record on appeal. The Supreme Court of Ohio has held that "allegations of ineffectiveness based on facts not appearing in the record should be reviewed through the postconviction remedies of R.C. 2953.21" rather than through direct appeal. *State v. Coleman*, 85 Ohio St.3d 129, 134 (1999). Thus, appellant's appellate counsel did not perform deficiently by failing to raise these two issues that necessarily relied on examination of materials outside the record on direct appeal. Moreover, this court has previously held that we cannot consider matters outside the record as a basis for reopening an appeal. *State v. Davis*, 10th Dist. No. 09AP-869, 2011-Ohio-1023, ¶ 12.

Appellant's third proposed assignment of error asserts the trial court violated appellant's right to be present at the joinder hearing. . . . Neither appellant nor plaintiff-appellee, State of Ohio, have cited any decisions from this court or the Supreme Court addressing the specific question of whether a criminal defendant has a right to be present at a joinder hearing. Likewise, we have not found any applicable precedent from this court or the Supreme Court. Accordingly, it appears that this would be an issue of first impression for this court. Under these circumstances, given the lack of precedent in his favor or any other showing by him, appellant has failed to demonstrate that there would have been a reasonable probability of success if this issue had been raised in his direct appeal. *See, e.g.*, *Alexander v. Smith*, 311 Fed.Appx. 875, 891 (6th Cir. 2009) ("[T]his claim fails since the petitioner has not demonstrated a 'reasonable probability' of success in his appeal even had these claims been presented. At the very least, they are novel and not the kind of slam-dunk arguments that would establish a reasonable probability of success.").

(*Memorandum Decision*, ECF No. 21-1, PAGEID # 1073-75.)

The *Strickland* test applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) . . . . Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. Id. citing Wilson. . . . The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751–752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751–52).

*Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2013 WL 831727, at *28 (S.D.

Ohio March 6, 2013). Factors to be considered in determining whether a defendant has been

denied the effective assistance of appellate counsel include:

(1) Were the omitted issues "significant and obvious"?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir. 1999) (citations omitted). Again, applying the deferential standard of review, Petitioner has failed to establish that he is entitled to relief.

As discussed by the state appellate court, neither the photographs depicting Petitioner's purported tattoo nor newspaper articles including a description of an unidentified suspect of the 2013 McDonald's robbery were made a part of the record on direct appeal. Petitioner therefore cannot establish that his appellate counsel was ineffective based on his attorney's failure to raise such off-the-record claims of ineffective assistance of trial counsel on direct appeal. These claims, as discussed by the state appellate court, would properly be raised in a state post-conviction petition. Further, this Court cannot consider here any evidence referred to by Petitioner in support of this claim (*see Traverse*, ECF No. 29, PAGEID # 3381-88) that the appellate court did not consider in adjudicating his claim. *See Dunlap v. Paskett*, No. 1:99-cv-

559, 2019 WL 1274862, at *6 (S.D. Ohio March 20, 2019) (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.")  Therefore, Petitioner cannot establish the denial of the effective assistance of appellate counsel on this basis.

The record also does not indicate that the state appellate court violated 28 U.S.C. § 2254(d) in rejecting Petitioner's claim that his attorney performed in a constitutionally ineffective manner by failing to assert on appeal that he unconstitutionally was denied his right to be present at the hearing on the joinder of offenses against him.   "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)).  This right is rooted in both the Due Process Clause and the Confrontation Clause of the Sixth Amendment.  *United States v. Goff*, 400 F. App'x 1, 16 (6th Cir. 2010) (citing *Gray v. Moore*, 520 F.3d 616, 622 (6th Cir. 2008)).  This right is not absolute but exists where the defendant's has a "relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Ralston v. Prelesnik*, No. 1:13-cv-4, 2016 WL 4646222, at *12 (W.D. Mich. Sept. 7, 2016) (citing *United States v. Henderson* 626 F.3d 326, 343 (6th Cir. 2010) (quoting *Stincer*, 482 U.S. at 745).  Thus, a defendant does not have the right to be present at a proceeding where his "presence would be useless, or the benefit but a shadow." *Stincer*, 482 U.S. at 745. Moreover, the right to be present during critical stages of a trial may be waived and is subject to harmless error analysis. *See Green v. Maclaren*, No. 2:14-cv-13393, 2017 WL 372009, at *11 (E.D. Mich. Jan. 26, 2017) (citing *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (other citations omitted).  In *Van v. Jones*, 475 F.3d 292 (6th Cir. 2007), the Sixth Circuit declined to find that a

consolidation hearing under Michigan procedure constituted a "critical stage" of a criminal proceeding.

Here, defense counsel had the opportunity to contest the State's request to join charges at the hearing on the issue and again prior to trial. The record does not indicate that Petitioner's presence at the pre-trial hearing would have contributed to the fairness of the hearing, served any useful purpose, or affected the trial court's ruling. Therefore, the Court is not persuaded that Petitioner can establish prejudice as that term is defined in *Strickland*. *See Green v. Maclaren*, No. 2:14-cv-13393, 2017 WL 372009, at *12 (E.D. Mich. Jan. 26, 2017).

Claims seven, eight and nine are without merit.

## VIII. Claims Ten, Eleven, Twelve, Thirteen, and Seventeen

In claims ten through thirteen and claim seventeen, Petitioner asserts that his convictions violate the Fourth Amendment. This issue does not provide him a basis for relief. Generally, Fourth Amendment claims do not provide a basis for federal habeas corpus relief, so long as the petitioner had an opportunity to present the claim to the state courts. *Stone v. Powell*, 428 U.S. 465, 482 (1976); *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982) (opportunity for full and fair litigation of a Fourth Amendment claim exists where the state procedural mechanism presents an opportunity to raise the claim, and presentation of the claim was not frustrated by a failure of that mechanism.)

> One, the key purpose of federal habeas corpus is to free innocent prisoners. But whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty. [*Stone v. Powell*], at 490, 96 S.Ct. 3037. Two, exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution. Any deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great. *Id*. at 493, 96 S.Ct. 3037.

*Good v. Berghuis*, 729 F.3d 636, 637 (6th Cir. 2013). Ohio permits a criminal defendant to file a motion to suppress evidence prior to trial. *See* Ohio R. Crim. P. 12(C)(3). Here, the record

reflects no basis upon which to find that Petitioner could not present his claims under the Fourth Amendment because of a failure of Ohio's procedural mechanism. To the contrary, the trial court held a hearing on Petitioner's motion to suppress evidence before denying the motion (ECF No. 21, PAGEID # 372; *Transcript of Motion to Suppress*, ECF Nos. 21-3, 21-4) and, in a lengthy discussion, the appellate court thereafter affirmed the trial court's denial of Petitioner's motion to suppress evidence. *State v. Neil*, 2016 WL 357459, at *9-16. Petitioner also had the opportunity to raise the issue in the Ohio Supreme Court. Thus, although Petitioner did not obtain a ruling in his favor, he had multiple opportunities to litigate this claim.

Petitioner nonetheless argues that he was denied a full and fair opportunity to litigate his Fourth Amendment claims, because the state courts ignored federal law and police lied. (*See Traverse*, ECF No. 29, PAGEID # 3391-94.) This argument is not persuasive. Perjury by police does not deprive a petitioner of a full and fair opportunity to litigate his Fourth Amendment claim, particularly where, as here, the petitioner has been provided the opportunity to litigate the perjury issue. *See Brown v. Berghuis*, 638 F.Supp.2d 795, 811-12 (E.D. Mich. July 29, 2009) (citations omitted). "As the Seventh Circuit has succinctly described the *Stone* rule, "'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." *Id*. at 812 (citing *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir. 2003)). Further, the Sixth Circuit has rejected the argument that "egregious misapplication of a controlling Supreme Court precedent" could justify a federal habeas court in concluding that a petitioner had been denied a full and fair opportunity for presentment of his Fourth Amendment claim. *See Eatmon v. Warden, Noble Correctional Institution*, 2016 WL 882097, at *6-7 (S.D. Ohio March 1, 2016) (citing *Gilbert v. Parke*, 763 F.2d 821, 824 (6th Cir. 1985)). In any event, the record does not indicate that the state courts ignored federal law or support a claim of "egregious error." *See id*. at *7.

Claims ten, eleven, twelve, thirteen, and seventeen do not provide a basis for relief.

## IX. Claim Fourteen

In claim fourteen, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to argue that the GPS tracking search warrant was unconstitutionally overbroad. The state appellate court rejected this claim, reasoning in relevant part as follows:

> {¶ 52} Appellant[]. . . asserts that his counsel provided ineffective assistance in various respects with regard to the November 2012 GPS tracking warrant. Appellant claims that his counsel was ineffective by failing to raise various alleged Fourth Amendment violations in support of the motion to suppress; we will consider each claim separately.

> {¶ 53} Courts apply a two-part test to evaluate claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141–42 (1989). "First, the defendant must show that counsel's performance was deficient." *Strickland* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." Id. This court has recognized that the failure to file a motion to suppress may constitute ineffective assistance of counsel when the record demonstrates that the motion would have been granted. *State v. Hawkins*, 10th Dist. No. 15AP–35, 2016–Ohio–1404, ¶ 93. Based on this principle, the failure to raise a particular argument in support of a motion to suppress may constitute ineffective assistance when the record demonstrates that the motion would have been granted had that argument been asserted. "Counsel is not deficient for failing to raise a meritless issue." *State v. Massey*, 10th Dist. No. 12AP–649, 2013–Ohio–1521, ¶ 13.

> {¶ 54} Appellant first argues that his counsel was ineffective by failing to object to extraneous testimony and evidence beyond the four corners of the Cress affidavit, as described in the seventh assignment of error. However, as explained above, we conclude that the trial court did not rely on this testimony in concluding that the Cress affidavit established probable cause for the warrant. Therefore, even if appellant could establish that his counsel performed deficiently, he cannot establish that he was prejudiced by the failure to object by demonstrating that the trial court would have granted the motion to suppress had the testimony been excluded.[6]

---

[6] The appellate court denied Petitioner's seventh error as follows:

> {¶ 32} In his seventh assignment of error, appellant appears to assert the trial court erred by relying on testimony presented at the suppression hearing, which was beyond the face of the Cress affidavit, in determining that the judge issuing the warrant had a substantial basis for concluding that probable cause existed. Appellant argues that the Cress affidavit failed to demonstrate the veracity and basis of knowledge to support the assertions contained therein; he claims that the trial court improperly

{¶ 55} Appellant next argues that his counsel was ineffective by failing to argue that granting a GPS tracking warrant for 90 days constituted a fundamental violation of Crim.R. 41(C)(2) and required automatic suppression of the evidence

---

relied on extraneous testimony from the suppression hearing to rehabilitate the allegedly insufficient affidavit.

{¶ 33} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized." The Ohio Constitution contains a nearly identical provision. Ohio Constitution, Article I, Section 14. See also R.C. 2933.22(A); Crim.R. 41(C).

{¶ 34} When determining whether a search warrant affidavit demonstrates probable cause, a magistrate must " 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). An appellate court reviewing the sufficiency of probable cause contained in an affidavit must not substitute its judgment for that of the magistrate but, rather, ensure that the magistrate "had a substantial basis for concluding that probable cause existed." *Id.* at paragraph two of the syllabus. This analysis is undertaken with great deference to the magistrate's determination of probable cause, and marginal cases should be resolved in favor of upholding the warrant. *Id.* The Supreme Court of Ohio has held that "when no oral testimony is presented to the neutral and detached magistrate in conjunction with an affidavit for a search warrant, the probable-cause determination is based on the four corners of the document." *State v. Castagnola*, 145 Ohio St.3d 1, 2015–Ohio–1565, ¶ 106.

{¶ 35} The trial court denied appellant's motion to suppress because it concluded that, given the totality of the circumstances, the Cress affidavit contained information providing the issuing magistrate with a substantial basis for concluding that probable cause for the warrant existed. However, despite appellant's contention in the seventh assignment of error, the trial court does not appear to rely on testimony beyond the face of the Cress affidavit to reach this conclusion. Instead, the trial court expressly referred to the information contained in the Cress affidavit and concluded that this information provided a substantial basis for the issuing magistrate to find probable cause to support the warrant. The trial court did refer to testimony from the suppression hearing, but this reference was in the context of addressing appellant's claim that the Cress affidavit contained material misrepresentations of fact that were presented in bad faith or in reckless disregard for the truth. In the motion to suppress, appellant argued that Detective Cress misrepresented the witnesses' descriptions of the robbery suspect, citing aspects of various witness statements that were not set forth in the affidavit. The trial court concluded that, based on the suppression hearing testimony, Detective Cress had a good-faith belief that he was presenting the facts in an accurate manner to the issuing magistrate. The court noted that, despite some variance in the witnesses' descriptions of the robbery suspect and the vehicle used in the robberies, there was a general theme to the descriptions and concluded that the Cress affidavit accurately set forth this information. Under these circumstances, we cannot conclude that the trial court improperly relied on testimony outside the four corners of the affidavit in determining that the magistrate had a substantial basis for finding probable cause.

{¶ 36} Accordingly, we overrule appellant's seventh assignment of error.

*State v. Neil*, 2016 WL 3574549, at *10-11.

obtained pursuant to the warrant. Appellant cites the provision of Crim.R. 41(C)(2) stating that the time an electronic tracking device may be used may not exceed 45 days. However, as the state notes, the portion of Crim.R. 41(C)(2) limiting the use of a tracking device to 45 days was enacted effective July 1, 2014, and, therefore, was not part of the rule at the time the November 2012 GPS tracking warrant was issued. Accordingly, granting a 90–day tracking warrant was not a per se constitutional violation. Appellant has failed to demonstrate that his counsel was deficient for failing to raise this issue or that the motion would have been granted had the issue been asserted in the motion to suppress.

{¶ 56} Appellant further asserts that his counsel was ineffective by failing to argue that the information contained in the Cress affidavit was stale because it had been included in the prior Franken affidavit in support of the January 2012 GPS tracking warrant, and that warrant had not resulted in evidence of criminal activity by appellant. "An affidavit in support of a search warrant must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time." *State v. Ingold*, 10th Dist. No. 07AP–648, 2008–Ohio–2303, ¶ 22. However, "[t]here is no arbitrary time limit that dictates when information becomes stale." *Id.* Moreover, this court has recognized that "'[w]here recent information corroborates otherwise stale information, probable cause may be found.'" *Id.* at ¶ 35, quoting *United States v. Spikes*, 158 F.3d 913 (6th Cir.1998). In this case, the Cress affidavit provided additional information arising from the November 8, 2012 Wendy's robbery, indicating that the suspect in that incident wore similar attire and used similar methods to the suspect in the 2011 robberies. The Cress affidavit also indicated that, shortly after the robbery, appellant's minivan had registered on a license plate reader mounted to a police cruiser that was in the area near the robbery. Assuming, without deciding, that the information regarding the series of robberies in 2011 was stale, this additional information may have served to corroborate the information about the earlier robberies. Under these circumstances, we conclude that appellant has failed to demonstrate that his counsel was deficient for failing to raise this issue or that the motion would have been granted had the issue been asserted in the motion to suppress.

{¶ 57} Finally, appellant argues that his counsel was ineffective for failing to argue that the warrant was unconstitutionally overbroad because it did not sufficiently describe the evidence to be obtained pursuant to the warrant. The November 2012 GPS tracking warrant provided that officers were authorized to install and use the tracking device to obtain evidence of the commission of the criminal offense of aggravated robbery. Appellant appears to argue that authorities may not use GPS tracking in an effort to catch a suspect in the act of committing a criminal offense, citing several cases including *United States v. Katzin*, E.D.Pa. No. 11–226 (May 9, 2012), *State v. Sullivan*, 10th Dist. No. 13AP–173, 2014–Ohio–1443, *State v. White*, 5th Dist. No. 13–CA–11, 2013–Ohio–5221, *United States v. Ford*, E.D.Tenn. No. 1:11–cr–42 (Sept. 12, 2012), and *United States v. Lee*, 862 F.Supp.2d 560 (E.D.Ky.2012). However, each of those courts was addressing a

scenario involving warrantless GPS tracking, not the question of whether a warrant sufficiently described the evidence to be obtained from the use of a GPS tracking device. Given the failure to clearly define or provide authority in support of this proposition, we cannot conclude that his counsel was ineffective for failing to raise it in support of the motion to suppress.

{¶ 58} Accordingly, we overrule appellant's. . . assignment of error.

*State v. Neil*, 2016 WL 3574549, at *16-18.

"When the underlying issue relating to ineffective assistance is a Fourth Amendment challenge, the habeas petitioner must show that the 'Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.'" *Ingram v. Prelesnik*, 730 F. App'x 304, 308 (6th Cir. 2018) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). For the reasons detailed by the state court of appeals, Petitioner cannot meet this burden here. No crimes attributed to the "counter jumper" robber were committed during the initial period that police conducted GPS surveillance of Petitioner's cars. *State v. Neil*, 2016 WL 3574549, at *5. Detective Todd Cress prepared an affidavit in support of a second GPS tracking warrant for Petitioner's vehicles after the November 8, 2012 Wendy's robbery, and installation of the GPS devices was authorized on November 9, 2012. *Id.* at *6. Thereafter, Petitioner admitted to his commission of the November 15, 2012 BMV robbery. Thus, Petitioner has failed to establish prejudice from installation of the second GPS tracking devices.

Claim fourteen is without merit.

## X. Claims Sixteen and Twenty

In claims sixteen and twenty, Petitioner asserts that he was denied a fair trial based on cumulative error. This claim does not provide him a basis for relief. "The Sixth Circuit repeatedly has held that 'the law of this Circuit is that cumulative error claims are not cognizable

on habeas because the Supreme Court has not spoken on this issue.'" *Billenstein v. Warden,*

*Warren Corr. Inst.,* No. 3:15-cv-1097, 2016 WL 4547413, at *8 (N.D. Ohio July 8, 2016) (citing

*Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir. 2006); *Moore v. Parker,* 425 F.3d 250, 256

(6th Cir. 2005); *Sheppard v. Bagley,* 657 F.3d 338, 348 (6th Cir. 2011)).

## XI. Disposition

**WHEREUPON** it is **RECOMMENDED** that the petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 be **DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation,* that party may, within fourteen

days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is

made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may

recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and*

*Recommendation* will result in a waiver of the right to have the district judge review the *Report*

*and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation.  See Thomas v. Arn,* 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED.**

s/ *Elizabeth A. Preston Deavers*
**Elizabeth A. Preston Deavers**
**Chief United States Magistrate Judge**